# IN THE DISTRICT COURT OF THE UNITED STATES

## For the Western District of New York

——————————

November 2009   GRAND JURY
(Empaneled 11/06/2009)

**THE UNITED STATES OF AMERICA**

   *-vs-*

**ANTHONY GALEA**

**INDICTMENT**

Violations:

Title 18, United States
Code, Sections 371,
1001(a)(2), 545 and 2;
Title 21, United States
Code, Sections
333(e)(1), 331(a) and
333(a)(2).
(5 Counts)

## INTRODUCTION

At all times pertinent to this Indictment:

1.   The defendant, ANTHONY GALEA, was a physician who practiced medicine at the Institute of Sports Medicine ("ISM"), located in Etobicoke, Ontario, Canada.

2.   The defendant, ANTHONY GALEA, was not a citizen of the United States and was not authorized to work in the United States or licensed to practice medicine in the United States.

3.   Mary Anne Catalano was an employee of ISM and was an assistant to the defendant, ANTHONY GALEA.

4.   Mary Anne Catalano was not a citizen of the United States and was not authorized to work in the United States.

5.   The Department of Homeland Security is and was a department within the executive branch of the Government of the United States.

6.   The lawful functions of the Department of Homeland Security included, but were not limited to, inspecting persons attempting to enter the United States and determining their admissibility into the United States for the claimed purpose.

7.   The lawful functions of the Department of Homeland Security further included, but were not limited to, ensuring that persons not authorized to work in the United States did not enter the United States for the purpose of working in the United States.

8. Border inspections of the defendant, ANTHONY GALEA, and of Mary Anne Catalano by the Department of Homeland Security occurred at ports of entry between the United States and Canada, including but not limited to the Peace Bridge in Buffalo, New York, the

Lewiston Bridge in Lewiston, New York, and at airports such as Lester B. Pearson International Airport ("Pearson Airport") in Toronto, Ontario, Canada, prior to the boarding of flights from Canada to various locations in the United States.

9.   The Food and Drug Administration ("FDA") is and was an agency within the United States Department of Health and Human Services.

10.   The FDA was charged with the responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA") and by ensuring, among other things, that drugs bore labeling containing true and accurate information and adequate directions for use.

11.   The FDCA, at Title 21, United States Code, Section 333(e)(1), prohibited knowingly distributing or possessing with intent to distribute human growth hormone for any use in humans other than the treatment of a disease or other recognized medical condition that had been authorized by the Secretary of Health and Human Services and that was pursuant to the order of a physician.

12.   The only uses of FDA-approved human growth hormone drugs that had been authorized by the Secretary of Health and Human Services for use in adults were the treatment of AIDS wasting or cachexia, short bowel syndrome, and somatropin syndrome in adults who meet one of two criteria, i.e., adult onset endogenous growth inadequacy due to pituitary or hypothalamic disease, surgery or trauma, or adults who had child-onset somatropin deficiency that was not treated.

13.   Human growth hormone was defined in Title 21, United States Code, Section 333(e)(4) as somatrem, somatropin, or an analogue of somatrem or somatropin.   Nutropin is a form of recombinant DNA somatropin.

14.   The FDCA, at Title 21, United States Code, Section 321(g)(1), defined drugs as, among other things, articles intended for use in the cure, mitigation, treatment or prevention of disease in man; articles intended to affect the structure or function of the body of man; or articles intended for use as components of other drugs.

15.   Under the FDCA, at Title 21, United States Code, Section 353(b)(1), a "prescription drug" was any drug which, because of its toxicity or other potentiality for harmful effect, or the method of

4

its use, or the collateral measures necessary to its use, was not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or it was limited by an approved new drug application to use under the professional supervision of a practitioner licensed by law to administer such drug.

16.   The FDCA, at Title 21, United States Code, Section 331(a), prohibited the introduction or delivery for introduction into interstate commerce, or the causing thereof, of any drug that was misbranded.

17.   Under the FDCA, at Title 21, United States Code, Section 352(c), a drug was deemed to be misbranded if all words, statements, or other information required by or under authority of the Act to appear on the label or labeling did not appear in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use. Regulations promulgated pursuant to the FDCA stated "[a]ll words, statements, and other information required by or under authority of [the Act] to appear on the label or labeling shall appear thereon in the English language."  21 C.F.R. § 201.15(c)(1).

18.   Under the FDCA, at Title 21, United States Code, Section 353(b)(4)(A), a prescription drug was deemed to be misbranded if at any time prior to dispensing, the label of the drug failed to bear the symbol "Rx only."

19.   Actovegin is a substance derived from calf's blood. Actovegin was a "drug" within the meaning of the FDCA because it was intended to be used to treat, among other things, injured muscles.  No drug containing Actovegin was approved for use in the United States.

20.   Nutropin was a "prescription drug" under the FDCA.

## COUNT I

### Conspiracy

### Title 18, United States Code, Section 371

### The Grand Jury Charges That:

1.   The allegations contained in the Section of this Indictment entitled "INTRODUCTION," in their entirety, are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

6

2.  Beginning not later than July 2007, and continuing until on or about September 14, 2009, in the Western District of New York and elsewhere, the defendant, ANTHONY GALEA, did knowingly, willfully and unlawfully combine, conspire and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a) to defraud the United States and the Department of Homeland Security, an agency of the United States, by interfering with and obstructing by means of deceit, craft and trickery the lawful governmental functions of the Department of Homeland Security in examining and determining the admissibility of persons, articles and merchandise entering the United States, in violation of Title 18, United States Code, Section 371;

b) to defraud the United States and the FDA, an agency of the United States, by interfering with and obstructing by means of deceit, craft and trickery the lawful governmental functions of the FDA, including regulating the introduction into interstate commerce and the distribution of human growth hormone, actovegin and other

7

drugs under the FDCA, in violation of Title 18, United States Code, Section 371;

c) to knowingly possess with intent to distribute human growth hormone for any use in humans other than the treatment of a disease or other recognized medical condition where such use had been authorized by the Secretary of Health and Human Services and pursuant to the order of a physician, in violation of Title 21, United States Code, Section 333(e)(1);

d) to, with intent to defraud and mislead, introduce and deliver into interstate commerce, drugs, including actovegin, which was misbranded within the meaning of Title 21, United States Code, Section 352(c), and nutropin, which was misbranded within the meaning of Title 21, United States Code, Section 353(b)(4)(A), in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2);

e) to fraudulently and knowingly import and bring into the United States merchandise contrary to law, in

violation of Title 18, United States Code, Section 545; and

f) to knowingly and willfully make materially false statements and representations in a matter within the jurisdiction of the United States Department of Homeland Security, an agency within the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001(a)(2);

## MANNER AND MEANS

3.   The conspiracy was carried out by the Manner and Means set forth below.

4.   It was part of the conspiracy that the defendant, ANTHONY GALEA, provided medical services to professional athletes in the United States, including but not limited to:

a) intravenous treatments, sometimes referred to as "Recovery IVs," which contained, among other things, actovegin (a substance derived

from calf's blood), and Adenosine Triphosphate (ATP);

b) injections containing a mixture of substances including but not limited to actovegin, administered for treatment of injured muscles;

c) injections containing a mixture of substances including but not limited to nutropin, a human growth hormone, injected into the knee and administered for the purpose of regenerating cartilage; and

d) plasma rich platelet ("PRP") treatments, which involved extracting blood from patients, spinning the blood in a centrifuge to separate the plasma from the red blood cells, and re-injecting the plasma into the patients.

5.  It was part of the conspiracy that the defendant, ANTHONY GALEA, entered the United States at Ports of Entry in the Western District of New York and elsewhere for the purpose of working in

the United States, that is, to provide drugs and medical services to professional athletes.

6.  It was part of the conspiracy that the defendant, ANTHONY GALEA, traveled from Canada to the United States to provide drugs and medical services to more than 20 professional athletes in the United States.   In order to provide medical services, the defendant, ANTHONY GALEA, traveled to numerous locations within the United States, including but not limited to: Hawaii; Cleveland, Ohio; New York, New York; Miami, Florida; Tampa, Florida; Orlando, Florida; Washington, D.C.; Boston, Massachusetts; Atlanta, Georgia; San Diego, California; San Francisco, California; Denver, Colorado; and Phoenix, Arizona.

7.  It was part of the conspiracy that the defendant, ANTHONY GALEA, provided medical services to professional athletes in the United States in such places as hotel rooms, their homes, and the homes of friends or acquaintances of the athletes.

8.  It was part of the conspiracy that the defendant, ANTHONY GALEA, directed Mary Anne Catalano to prepare invoices to bill patients for drugs and medical services as well as for travel and lodging expenses.  Medical services were generally described on the invoices as "Consultation," for which the charge often was $1,500

or $3,500 for a single visit to one patient.  Travel and lodging expenses were charged in addition to "Consultation."

9.  It was part of the conspiracy that the defendant, ANTHONY GALEA, from time to time, provided medical services to several professional athletes at the same location during the same trip to the United States.  On some such occasions, a single invoice covering the medical treatments for all the players who received treatments was provided to one player for payment.

10.  It was part of the conspiracy that the defendant, ANTHONY GALEA, billed his patients for drugs, medical services, supplies, travel and lodging in an amount exceeding $500,000 relating to medical services provided in the United States.

11.  It was part of the conspiracy that, at the direction of the defendant, ANTHONY GALEA, Mary Anne Catalano prepared a "Checklist" of items to take when traveling from Canada to the United States to enable the defendant, ANTHONY GALEA, to treat patients within the United States.  Those items, as set forth on the checklist, included but were not limited to:

       a) IV bags;

       b) IV Tubing;

       c) ATP (German);

d) syringes;

e) GINSENG;

f) NUTROPIN;

g) Actovegen;

h) Centrifuge;

i) Cialis/Viagara; and

j) Celebrex

12.  It was part of the conspiracy that, at the direction of the defendant, ANTHONY GALEA, Mary Anne Catalano traveled to Munich, Germany, to pick up a supply of actovegin and returned to Canada with a supply of actovegin.

13.  It was part of the conspiracy that, if asked by a patient, the defendant, ANTHONY GALEA, gave Viagra or Cialis to that patient free of charge and without a prescription.  It was further part of the conspiracy that the defendant, ANTHONY GALEA, instructed Mary Anne Catalano to take Viagra and Cialis out of their original packages and to put them in non-descript pill bottles so as to make detection of them less likely during border inspections when entering the United States.

14.   It was part of the conspiracy that the defendant, ANTHONY GALEA, instructed Mary Anne Catalano not to specify, on certain invoices, the names of the drugs sold to patients or administered to them during medical treatments.

15.   It was part of the conspiracy that, regarding invoices for a patient bearing dates between on or about June 5, 2009, and on or about August 26, 2009, the defendant, ANTHONY GALEA, instructed Mary Anne Catalano to use such phrases as "Ultrasound diagnostic testing," or "Ultrasound diagnostic imaging," or "Diagnostic ultrasound" rather than specify the drugs administered to or sold to that patient, when, in fact, the defendant, ANTHONY GALEA, did not perform ultrasound testing or ultrasound imaging on that patient.

16.   It was part of the conspiracy that the defendant, ANTHONY GALEA, and Mary Anne Catalano from time to time traveled by car together from Canada to the United States and entered the United States at ports of entry in the Western District of New York.

17.   It was part of the conspiracy that the defendant, ANTHONY GALEA, told Mary Anne Catalano that, in response to questions by officers of the United States Department of Homeland Security, she

14

should falsely state that the purpose of her and the defendant's entry into the United States was to attend a medical conference, when, in truth and in fact, their purpose for entering the United States was for the defendant, ANTHONY GALEA, to provide drugs and medical services to individuals, including professional athletes, within the United States.

18.  It was part of the conspiracy that the defendant, ANTHONY GALEA, from time to time directed that he and Mary Anne Catalano travel separately from Canada to the same destination within the United States and that Mary Anne Catalano carry the drugs and medical supplies necessary to provide medical services to professional athletes within the United States.  It was further part of the conspiracy that the purpose of traveling separately to the United States was to prevent the defendant, ANTHONY GALEA, from being detected while importing drugs and medical supplies when inspected at ports of entry by officers of the United States Department of Homeland Security.

19.  It was part of the conspiracy that, whether traveling from Canada to the United States together or separately, the defendant, ANTHONY GALEA, and Mary Anne Catalano agreed that, in response to questions asked by officers from the United States

Department of Homeland Security regarding the purpose of their travel to the United States, they would falsely respond that the purpose of their travel to the United States was to attend a medical conference, when in fact the purpose of their travel to the United States was for the defendant, ANTHONY GALEA, to provide drugs and medical services to individuals, including professional athletes, in the United States.

20.  It was part of the conspiracy that the defendant, ANTHONY GALEA, from time to time would travel to and within the United States and provide drugs and medical services to patients within the United States unaccompanied by Mary Anne Catalano.

21.  It was part of the conspiracy that, at the direction of the defendant, ANTHONY GALEA, Mary Anne Catalano from time to time would travel alone from Canada to the United States for the purpose of delivering substances to patients of the defendant, ANTHONY GALEA, within the United States, including but not limited to ATP ampules in a form suitable for intramuscular injection.

22.  It was part of the conspiracy that the defendant, ANTHONY GALEA, from time to time directed Mary Anne Catalano to travel from Canada to the United States to drop off drugs and medical supplies to a relative of the defendant who lived in New York City in order

to maintain a supply of drugs and medical supplies there and to enable the defendant, ANTHONY GALEA, to pick up the items when he traveled to New York City to treat patients.

23.  It was part of the conspiracy that the defendant, ANTHONY GALEA, would leave drugs and medical supplies with patients in the United States and caused ATP to be sent to places within the United States by commercial carriers.

## OVERT ACTS

24.  In furtherance of the conspiracy and to effect the objects thereof, the following overt acts were performed.

25.  On or about August 13, 2009, the defendant, ANTHONY GALEA, traveled by air from Toronto, Ontario, Canada, to Cleveland, Ohio, to provide a medical treatment to a patient at a hotel in the Cleveland, Ohio, area.

26.  On or about August 13, 2009, Mary Anne Catalano entered the United States from Canada at the Peace Bridge Port of Entry in Buffalo, New York, in a motor vehicle, and traveled to the Cleveland, Ohio, area to meet with the defendant, ANTHONY GALEA, and his patient at a hotel in the Cleveland, Ohio, area.

17

27.  On or about August 13, 2009, at the hotel referred to in the preceding paragraph, the defendant, ANTHONY GALEA, directed Mary Anne Catalano to facilitate the process whereby the defendant, ANTHONY GALEA, would provide human growth hormone to the patient and to another person.

28.  On or about August 27, 2009, at the direction of the defendant, ANTHONY GALEA, Mary Anne Catalano, while in possession of somatropin, entered the United States from Canada at the Peace Bridge Port of Entry in Buffalo, New York.

29.  On or about August 27, 2009, at the direction of the defendant, ANTHONY GALEA, Mary Anne Catalano delivered two kits of somatropin, each containing 10 vials of somatropin, to the home of the persons referred to above in paragraph 26, for which the defendant charged them $1,200 per kit.

30.  On or about September 14, 2009, at the direction of the defendant, ANTHONY GALEA, Mary Anne Catalano, attempted to enter the United States as the sole person in a motor vehicle at the Peace Bridge Port of Entry in Buffalo, New York.

31.  On or about September 14, 2009, while attempting to enter the United States at the Peace Bridge port of entry in Buffalo, New York, Mary Anne Catalano was in possession of numerous drugs and medical supplies, including but not limited to nutropin, actovegin, ATP, a centrifuge, a diagnostic ultrasound machine, needles, syringes and other drugs and medical supplies.  Some of the drugs in Mary Anne Catalano's possession were labeled in foreign languages.

32.  On or about September 14, 2009, at the Peace Bridge Port of Entry in Buffalo, New York, Mary Anne Catalano, in accordance with her agreement with the defendant, ANTHONY GALEA, falsely told officers and agents of the Department of Homeland Security that the purpose of her attempted entry into the United States was to attend a medical conference, when in fact the purpose of her attempted entry into the United States was to meet the defendant, ANTHONY GALEA, in the Washington, D.C., area to provide medical services to a professional athlete there.

33.  On or about the dates and at the ports of entry specified below, as well as on numerous other occasions, the defendant, ANTHONY GALEA, entered the United States from Canada in order to

provide medical services, drugs or both to patients within the United States.

| ¶ No. | Date | Port of Entry |
|---|---|---|
| 34 | October 26, 2007 | Peace Bridge |
| 35 | November 2, 2007 | Peace Bridge |
| 36 | November 9, 2007 | Peace Bridge |
| 37 | November 20, 2007 | Peace Bridge |
| 38 | November 23, 2007 | Peace Bridge |
| 39 | November 26, 2007 | Peace Bridge |
| 40 | November 30, 2007 | Peace Bridge |
| 41 | December 4, 2007 | Peace Bridge |
| 42 | December 6, 2007 | Pearson Airport |
| 43 | December 10, 2007 | Peace Bridge |
| 44 | December 14, 2007 | Peace Bridge |
| 45 | December 17, 2007 | Peace Bridge |
| 46 | December 21, 2007 | Peace Bridge |
| 47 | December 28, 2007 | Peace Bridge |
| 48 | January 13, 2008 | Pearson Airport |
| 49 | March 2, 2008 | Pearson Airport |
| 50 | July 9, 2008 | Pearson Airport |
| 51 | July 21, 2008 | Pearson Airport |
| 52 | July 28, 2008 | Peace Bridge |
| 53 | August 6, 2008 | Peace Bridge |
| 54 | August 11, 2008 | Peace Bridge |
| 55 | August 19, 2008 | Peace Bridge |
| 56 | August 25, 2008 | Peace Bridge |
| 57 | September 5, 2008 | Peace Bridge |

| ¶ No. | Date | Port of Entry |
|---|---|---|
| 58 | September 10 ,2008 | Peace Bridge |
| 59 | September 19, 2008 | Peace Bridge |
| 60 | September 26, 2008 | Peace Bridge |
| 61 | October 1, 2008 | Peace Bridge |
| 62 | October 10, 2008 | Peace Bridge |
| 63 | October 17, 2008 | Peace Bridge |
| 64 | October 29, 2008 | Peace Bridge |
| 65 | November 3, 2008 | Pearson Airport |
| 66 | November 13, 2008 | Peace Bridge |
| 67 | November 17, 2008 | Peace Bridge |
| 68 | November 19, 2008 | Peace Bridge |
| 69 | November 21, 2008 | Peace Bridge |
| 70 | November 28, 2008 | Peace Bridge |
| 71 | December 2, 2008 | Pearson Airport |
| 72 | December 13, 2008 | Peace Bridge |
| 73 | December 19, 2008 | Peace Bridge |
| 74 | December 25, 2008 | Pearson Airport |
| 75 | January 22, 2009 | Pearson Airport |
| 76 | January 27, 2009 | Pearson Airport |
| 77 | January 31, 2009 | Pearson Airport |
| 78 | February 4, 2009 | Pearson Airport |
| 79 | February 6, 2009 | Pearson Airport |
| 80 | February 16, 2009 | Pearson Airport |
| 81 | February 20, 2009 | Pearson Airport |
| 82 | March 2, 2009 | Pearson Airport |
| 83 | March 24, 2009 | Pearson Airport |
| 84 | April 3, 2009 | Pearson Airport |

| ¶ No. | Date | Port of Entry |
|-------|------|---------------|
| 85 | April 19, 2009 | Pearson Airport |
| 86 | April 26, 2009 | Pearson Airport |
| 87 | May 1, 2009 | Pearson Airport |
| 88 | May 13, 2009 | Pearson Airport |
| 89 | May 17, 2009 | Pearson Airport |
| 90 | May 19, 2009 | Peace Bridge |
| 91 | May 23, 2009 | Pearson Airport |
| 92 | May 30, 2009 | Lewiston Bridge |
| 93 | June 4, 2009 | Pearson Airport |
| 94 | June 9, 2009 | Pearson Airport |
| 95 | June 13, 2009 | Pearson Airport |
| 96 | June 21, 2009 | Pearson Airport |
| 97 | July 1, 2009 | Pearson Airport |
| 98 | July 6, 2009 | Peace Bridge |
| 99 | July 8, 2009 | Pearson Airport |
| 100 | July 22, 2009 | Pearson Airport |
| 101 | August 4, 2009 | Pearson Airport |
| 102 | August 6, 2009 | Pearson Airport |
| 103 | August 13, 2009 | Pearson Airport |
| 104 | August 26, 2009 | Pearson Airport |
| 105 | August 27, 2009 | Pearson Airport |
| 106 | September 1, 2009 | Pearson Airport |
| 107 | September 11, 2009 | Pearson Airport |

108.   On or about August 6, 2009, and on or about August 12, 2009, the defendant, ANTHONY GALEA, traveled to: New York City

22

(twice); Tampa, Florida; San Francisco, California; San Diego, California; Boston, Massachusetts; and Washington, D.C., prior to returning to Canada on or about August 12, 2009.


**All in violation of Title 18, United States Code, Section 371.**


## COUNT II

**Possession of Human Growth Hormone with Intent to Distribute**

**Title 21, United States Code, Section 333(e)(1) and
Title 18, United States Code, Section 2**


**The Grand Jury Further Charges That:**


1.   The allegations in the sections of this Indictment entitled "INTRODUCTION" and "MANNER AND MEANS" of COUNT I, in their entirety, are repeated and re-alleged and incorporated by reference, as if fully set forth herein.


2.   The allegations in paragraphs 28-29 of the section of COUNT I this Indictment entitled "OVERT ACTS" are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

3.   On or about August 27, 2009, in the Western District of New York and elsewhere, the defendant, ANTHONY GALEA, did knowingly possess with intent to distribute human growth hormone for a use in humans other than the treatment of a disease or other recognized medical condition where such use had been authorized by the Secretary of Health and Human Services and pursuant to the order of a physician.

**All in violation of Title 21, United States Code, Section 333(e)(1) and  Title 18, United States Code, Section 2.**

## COUNT III

**Introducing Misbranded Drugs Into Interstate Commerce**

**Title 21, United States Code, Sections 331(a) and 333(a)(2), and Title 18, United States Code, Section 2**

**The Grand Jury Further Charges That:**

1.   The allegations in the sections of this Indictment entitled "INTRODUCTION" and "MANNER AND MEANS" of COUNT I, in their entirety, are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

2.   The allegations in paragraphs 30-32 of the section of COUNT I this Indictment entitled "OVERT ACTS" are repeated and re-

24

alleged and incorporated by reference, as if fully set forth herein.

3.   On or about September 14, 2009, in the Western District of New York, the defendant, ANTHONY GALEA, did, with intent to defraud and mislead, introduce and deliver and cause to be introduced and delivered into interstate commerce drugs that were misbranded, namely:

a)   actovegin, which was misbranded within the meaning of Title 21, United States Code, Section 352(c) and Title 21, Code of Federal Regulations, Section 201.15(c)(1), in that the words, statements, and information which were required by or under authority of the Act to appear on the labels and labeling did not appear in such terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use, in that they were in foreign languages; and

b)   nutropin, a prescription drug that was misbranded within the meaning of Title 21, United States Code, Section 353(b)(4)(A), in that, prior to dispensing, the label failed to bear the symbol "Rx only."

All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2), and Title 18, United States Code, Section 2.

## COUNT IV

### Smuggling

### Title 18, United States Code, Sections 545 and 2

### The Grand Jury Further Charges That:

1.   The allegations in the sections of this Indictment entitled "INTRODUCTION" and "MANNER AND MEANS" of COUNT I, in their entirety, are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

2.   The allegations in paragraphs 28-29 of the section of COUNT I this Indictment entitled "OVERT ACTS" are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

3.   On or about August 27, 2009, in Buffalo, New York, in the Western District of New York, the defendant, ANTHONY GALEA, did knowingly bring into the United States merchandise, that is, somatropin, contrary to law, that is, the requirements of Title 19,

United States Code, Section 1461, and the regulations promulgated thereunder, to declare and unload merchandise imported or brought into the United States.

**All in violation of Title 18, United States Code, Sections 545 and 2.**

## COUNT V

**False Statements**

**Title 18, United States Code, Sections 1001(a)(2) and 2**

**The Grand Jury Further Charges That:**

1.   The allegations in the sections of this Indictment entitled "INTRODUCTION" and "MANNER AND MEANS" of COUNT I, in their entirety, are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

2.   The allegations in paragraphs 30-32 of the section of COUNT I this Indictment entitled "OVERT ACTS" are repeated and re-alleged and incorporated by reference, as if fully set forth herein.

3.   On or about September 14, 2009, in Buffalo, New York, in the Western District of New York, the defendant, ANTHONY GALEA, in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully aid, abet, counsel, command, induce, procure and cause Mary Anne Catalano to make materially false, fictitious, and fraudulent statements and representations, that is, to falsely and fraudulently state to officers and agents of the United States Department of Homeland Security that the purpose of her entry into the United States was to attend a medical conference, and that medical equipment and supplies she was carrying were to be displayed at that conference, when in fact, as the defendant, ANTHONY GALEA, well knew and believed, Mary Anne Catalano's purpose for entering the United States was to deliver such medical equipment and supplies to her employer, the defendant, ANTHONY GALEA, in order for the defendant, ANTHONY GALEA, to use such equipment and supplies to perform a medical procedure upon a person in the United States.

**All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.**

DATED: Buffalo, New York, October 14, 2010.


                              WILLIAM J. HOCHUL, JR.
                              United States Attorney


                              S/ PAUL J. CAMPANA
                         BY:  PAUL J. CAMPANA
                              Assistant U.S. Attorney
                              Assistant United States Attorney
                              United States Attorney's Office
                              Western District of New York
                              138 Delaware Avenue
                              Buffalo, New York 14202
                              (716) 843-5700, ext. 819
                              Paul.J.Campana@usdoj.gov

A TRUE BILL:


S/FOREPERSON
FOREPERSON