```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2

 3   UNITED STATES OF AMERICA,    *        Docket No. 10-CR-307A
                                  *
 4                                *
                                  *
 5                                *        Buffalo, New York
                 v.               *        July 6, 2011
 6                                *        3:12 p.m.
                                  *
 7   ANTHONY GALEA,               *
                                  *
 8              Defendant.        *
                                  *
 9   * * * * * * * * * * * * * *  *

10
                      TRANSCRIPT OF ARRAIGNMENT AND PLEA
11                 BEFORE THE HONORABLE RICHARD J. ARCARA
                      UNITED STATES DISTRICT COURT JUDGE
12

13

14   APPEARANCES:

15
     For the Plaintiff:          PAUL J. CAMPANA, ESQ.
16                               Assistant United States Attorney
                                 Appearing for the United States
17

18
     For the Defendant:          MARK J. MAHONEY, ESQ.
19                               and BRIAN H. GREENSPAN, ESQ.

20

21
     Court Reporter:             YVONNE M. GARRISON, RPR
22                               Official Court Reporter
                                 U.S.D.C., W.D.N.Y.
23                               68 Court Street
                                 Buffalo, New York 14202
24                               716-866-7314

25
```

1          THE CLERK:  Criminal Action 2010-307A, United States

2    versus Anthony Galea, arraignment and plea.

3          Counsel, please state your name and the party you

4    represent for the record.

5          MR. CAMPANA:  Paul Campana for the United States.

6          MR. MAHONEY:  Your Honor, Mark Mahoney for Dr. Galea.

7          And, Your Honor, thank you very much for the courtesy

8    of allowing Brian Greenspan to come forward today, and he's --

9    I don't know if our motion pro hac vice has been filed as of

10   yet, but I just wanted to take that moment to introduce you to

11   Brian Greenspan right here, Judge.

12         MR. GREENSPAN:  Good afternoon, Judge.

13         MR. MAHONEY:  Seth Weinstein is his associate is

14   sitting back there.  Brian is -- as well known as I am here,

15   he's as well known in Canada.  In the entire country he is a

16   very preeminent attorney up there and I'm very grateful he's

17   able to be here today.

18         THE COURT:  My prior life I had a lot of dealings

19   with the Crown Attorneys in Ontario and they were always very

20   courteous and polite and professional to me.  So there was no

21   way I wasn't going to do that in turn.

22         MR. GREENSPAN:  Most appreciative, sir.

23         THE COURT:  Sit down and relax, sir.

24         MR. GREENSPAN:  Thank you.

25         (Off the record discussion.)

1          THE COURT:  We're here to conduct some very important

2     business.

3          Mr. Campana.

4          MR. CAMPANA:  Your Honor, we're here for an

5     arraignment and then to present a plea agreement to the Court.

6          THE COURT:  All right.  Mr. Campana.

7          MR. CAMPANA:  There's been an indictment returned in

8     October of last year, October 14th of 2010.  Mr. Mahoney had

9     received a copy of it later that month, and he has told me that

10    he has received it and will waive further reading.

11         THE COURT:  Okay.  Now, this is how many counts?

12         MR. CAMPANA:  There's -- the indictment has five

13    counts and we are here for a plea to Count 3.

14         THE COURT:  All right.  That's your understanding?

15         MR. MAHONEY:  Yes, Judge.

16         We've received the indictment, waive the reading of

17    the indictment, and the plea is not guilty as to all the counts

18    of the indictment.

19         THE COURT:  And we're here to here today to plead

20    guilty to Count 3?

21         MR. MAHONEY:  Yes.  That's correct.

22         THE COURT:  Okay.  Would you please administer the

23    oath to Dr. Galea?

24         MR. MAHONEY:  Galea, Judge.

25         THE CLERK:  Please raise your right hand.

1          (The defendant is sworn.)

2          THE COURT:  Sir, you're now under oath, and being

3   under oath during the course of these proceedings I'll be

4   asking you a number of questions.  You'll have --

5          THE DEFENDANT:  Okay.

6          THE COURT:  You'll have to answer these questions

7   honestly and truthfully.  If you were to give me any false

8   answer, that false answer may be used against you in further

9   prosecution brought by the government on a charge of perjury or

10  making a false statement while under oath.

11         Do you understand that, sir?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  It's also very important that you

14  understand what your rights are.  If at any time during the

15  course of these proceedings there's something you do not

16  understand, you want to ask me a question, you want to consult

17  with your attorney, you want something more fully explained to

18  you, you're free to do so.  You're encouraged to do so.

19         It's not important that we get this over with as

20  quickly as possible.  What's important here is that I'm

21  satisfied that you fully understand what your rights are.

22         Do you understand that, sir?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Now, it's my understanding you're here

25  today to waive certain rights and to plead guilty to Count 3 of

1   the indictment under the terms and conditions of the plea

2   agreement.

3           Do you understand this charge, sir?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Mr. Mahoney, you've gone over this charge

6   with your client.  It's pretty straightforward.  I assume

7   you've gone over the elements of the charge with him.

8           Are you satisfied that he fully understands it?

9           MR. MAHONEY:  Yes, Judge, I am.

10          THE COURT:  Any reason for me to go through any

11  further explanation?

12          MR. MAHONEY:  No, not at all.

13          THE COURT:  And you reviewed with him his rights

14  under Rule 11:  Right to a trial, right to a lawyer, I guess,

15  rights under the extradition proceedings, and he understands

16  all those rights?

17          MR. MAHONEY:  That's correct, Judge.

18          THE COURT:  And you've reviewed with him the terms

19  and conditions of the plea agreement and he understands them?

20          MR. MAHONEY:  Yes.

21          THE COURT:  Now, sir, you've discussed this whole

22  matter with your lawyer, I assume at length, and your Canadian

23  counsel.  Through those discussions I'm sure you didn't like to

24  hear what they had to tell you, but they're not there to make

25  you feel good.  They're there to make your -- give you legal

1    advice and, apparently, based on those discussions, you're here

2    today to waive certain rights and to plead guilty to this

3    charge, Count 3, under the terms and conditions of the plea

4    agreement.

5              Are you fully satisfied with the advice from counsel

6    that you received from your lawyers in this matter?

7              THE DEFENDANT:  Yes, I did, Your Honor.

8              THE COURT:  Any complaints?

9              THE DEFENDANT:  No, sir.

10             THE COURT:  All right.  With that, Mr. Campana, let's

11   proceed through the plea agreement.

12             MR. CAMPANA:  Thank you, Your Honor.

13             Anthony Galea and the U.S. Attorney's Office have

14   agreed to this plea.

15             The charge to which the plea will be entered is

16   Count 3, which charges a violation of Title 21 Sections 331(a)

17   and 333(a)(2), which is introducing misbranded drugs into

18   interstate commerce with intent to mislead an agency of the

19   United States Government.

20             The maximum penalty upon conviction would be three

21   years imprisonment, a fine of $250,000 and a mandatory $100

22   special assessment.  Those being the maximum penalties.

23             THE COURT:  Do you understand that, sir?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Mr. Mahoney, you've explained to him the

1    importance of this paragraph?

2              MR. MAHONEY:  Yes, Judge.

3              THE COURT:  And, Mr. Campana, what is the importance

4    of this paragraph?

5              MR. CAMPANA:  Your Honor, the importance of the

6    paragraph is two-fold.

7              First, it complies with Rule 11 of our Criminal Rules

8    and advises the defendant of the maximum penalties he could

9    face.

10             Secondly, there are the sentencing guidelines.  And

11   the sentencing guidelines are advisory, not mandatory.  The

12   Court must consult them, and then impose a sentence not greater

13   than necessary, and -- but severe enough to satisfy the ends of

14   justice.

15             THE COURT:  Do you understand that, sir?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Mr. Mahoney's explained to you these

18   guidelines?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Yeah.  I'm going to take a minute to

21   explain them to you.

22             These guidelines went into effect in 1987 as a result

23   of what Congress of the United States felt was unwarranted

24   disparity in sentencing.  What does that mean?  They felt that

25   certain sentences that were being administered by judges, that

1  some cases the sentence may have been more severe than they

2  should have been and more lenient in other cases.

3          So they felt it was important to develop a system

4  within the United States that would have a uniform -- well, as

5  much as possible -- a uniform sentencing so that individuals

6  committing similar crimes under similar circumstances would

7  receive somewhat of a similar sentence, not necessarily exactly

8  the same, but to put some kind of uniform into it.  Some kind

9  of discipline, you might say, into the process.

10          Before the guidelines went into effect, the judge had

11  total discretion to impose any sentence that the judge felt, up

12  to the maximum.  Anything -- let's assume that you had a

13  sentencing range of maybe a maximum, maybe, 20 years.  Some

14  judges maybe have given people sentences of, let's say,

15  probation.  Other judges, under the same circumstances, may put

16  people in jail for like 20 years.

17          I like to think that's an exaggerated example, but

18  that's what could have happened with very little right to

19  appeal.  That was pretty much what you were stuck with.  And

20  they felt that we needed something a little more uniform, so

21  they formed a commission.

22          The commission is -- was formed back in 1986,

23  somewhere in that period.  And there were seven commissioners.

24  Who are these people?  They're appointed by the president,

25  confirmed by the Senate of the United States, and they serve a

1  term of four years. They still exist today.

2  These guidelines are still an evolving process.

3  They're, as Mr. Campana indicated, they're advisory, they're

4  not compulsory. They used to be at one time compulsory, but

5  that's not the case today.

6  And what they did is they conducted hearings

7  throughout the United States and they heard from law

8  professors, law enforcement people, defense lawyers, professors

9  and clerks and everyday citizens to find out what the input

10 could be to develop a system that would be fair because it was

11 a major, major undertaking to try to develop some kind of

12 system that would be uniform throughout the United States.

13 And when they got done, they wrote these guidelines.

14 It's kind of like a road map, you might say. If you wanted to

15 go some place and you pulled out AAA, or whatever, map, it's a

16 big book. And every single violation of every single statute

17 has a -- what they call an offense level.

18 This table here is kind of an important table.

19 You're going to end up somewhere on this table. You want to

20 end up as far to the top of this table as you can and as far

21 away from the bottom because these numbers in the middle here

22 represent months, a range of months, that are being recommended

23 to the Court, and the Court's going to carefully consider it.

24 Every violation of every federal statute, no matter

25 where you are in the United States, will receive a number, 1 to

1    43.  Why they picked 43, I don't know.  But they picked 43

2    numbers, okay.  The higher the number, the more serious the

3    offense.

4            And we're going to go through it as it applies to you

5    in a few minutes, but I want to make sure you have a basic

6    understanding.  I know Mr. Mahoney is doing a much better job

7    than I did right now explaining this to you.

8            So what you do, you find out the violation, you go to

9    the book, no matter where in the United States these are the

10   numbers.  Hypothetically let's say the number is 29, okay.

11   Then you say, well, we can't stop there, we have to make it fit

12   the individual.  We have to make -- there's very different

13   circumstances in each case, aggravating and mitigating.  So you

14   get an adjustment.  So the number will go up or down, depending

15   upon the situation, until we find a number that would fit the

16   individual.

17           Once we get to that number, then there is like --

18   there's six columns across this page.  If you're a first-time

19   offender you end up in the first column, which is the most

20   desirable.  If you're like public enemy number one, you end up

21   in column six, or somewhere in between.

22           And you can see those numbers get higher.  Obviously,

23   the best place to be would be a number one.  Obviously, the

24   theory being if you're a first-time offender that person should

25   not be treated the same as someone who's had many violations of

1    the law.  When that gets all done, you end up on the board and

2    that gives you recommendations as to what the sentence should

3    be.  Okay.

4            Now, as I said, they're advisory and we have to

5    consider all factors.  But this gives a starting point, and

6    certainly something that every judge in the United States

7    carefully considers as to what the sentence should be.  Okay.

8            Now, let's assume that it comes out at a particular

9    number and the Court felt that -- I think a higher number is

10   more reasonable.  I'd have to explain that to you, and we'll go

11   through that in minute, why I think it's a more reasonable

12   sentence, or lower.  It can go either way.

13           And the government would have certain rights if the

14   Court went lower and the government felt that it should be

15   higher.

16           When I've done that, okay -- let's assume I said,

17   well, in your case I think the maximum sentence of three years

18   is appropriate and here's the reasons.  You could say, Judge, I

19   think you're dead wrong.

20           We'd have a hearing on it and you could argue for a

21   lower sentence or a sentence that's consistent with the terms

22   and conditions of the plea agreement.  If I were to still go to

23   a higher range, you could appeal that.  And we'll talk about

24   that in a few minutes.

25           Under no circumstances, no matter what the

1   circumstances are, I can never go higher than what is set forth

2   in paragraph 1 of the plea agreement.  That's the statutory

3   maximum, okay.

4          So what it does, it gives you some idea as to what

5   the sentencing range could be.  Before you didn't know -- have

6   any idea.  You didn't know whether you were going to get

7   probation or three years imprisonment.  In some cases where the

8   sentence is higher, up to maybe 20 years, whatever.  Okay.

9          Do you understand all this?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  As I said, I know Mr. Mahoney did a much

12   better job than I did, but I want you to get a fundamental idea

13   of what we're doing here.  Okay?  Because this is very

14   important that you understand this because this is an important

15   decision you're making here today.  All right.

16          Mr. Campana.

17          MR. CAMPANA:  In paragraph 2 we state the supervised

18   release factor.  And if the defendant were to have a prison

19   sentence imposed and then thereafter a term of supervised

20   release, during that supervised release he'd have to obey the

21   terms and conditions, and if he was in violation of them the

22   Court could imprison him for an additional year.

23          THE COURT:  What supervised release means -- we used

24   to refer to that in the state courts and they still do but not

25   in the federal system in the United States.  Supervised release

1    is like parole.  After any term of imprisonment then you'll be

2    under the control of the Court.  And if you were to violate any

3    of the conditions of supervised release, parole, you want to

4    call it, that you would be brought back here in court, you'd be

5    entitled to a hearing.  If it proved that you did violate it,

6    then the Court would then impose a sentence of up to the

7    maximum, which Mr. Campana in paragraph 2 just stated.

8             Do you understand that, sir?

9             THE DEFENDANT:  Yes, sir.

10            MR. CAMPANA:  Thank you, Judge.

11            In paragraph 3 we set forth the elements of the

12   offense which the government would have to prove at trial.  And

13   they are set forth as follows:  That the defendant introduced

14   one or more drugs into interstate commerce; secondly, that the

15   drugs were misbranded; and third, that there was an intent to

16   mislead one or more agencies of the United States Government.

17            THE COURT:  Do you understand that, sir?

18            THE DEFENDANT:  Yes, sir.

19            MR. CAMPANA:  Next, on the following page, we set

20   forth at some length the factual basis of the agreement -- of

21   the plea.  And this relates to a period between early 2007 and

22   September of 2009.  At those relevant times or during that

23   period, Dr. Galea was a citizen of Canada, as he still is,

24   resides in Canada, and is a physician licensed to practice

25   medicine there.

1          He, however, is not licensed to practice medicine in

2    the United States.  He operated a medical practice in

3    Etobicoke, Ontario outside of Toronto called the Institute of

4    Sports Medicine and his assistant there was Mary Anne Catalano,

5    who was employed there.  That would be proved through the

6    testimony of Ms. Catalano and some of the records that were

7    seized from her in September of 2009.

8          The defendant traveled to the United States from

9    Canada on numerous occasions to treat patients here.  Sometimes

10   he traveled with Ms. Catalano, sometimes they traveled

11   separately.  They crossed at different places.  The purpose of

12   their coming to the United States was to treat patients here.

13   These patients were professional athletes from, among other

14   organizations, Major League Baseball and the National Football

15   League.

16         Ms. Catalano would be the witness who would testify

17   to those facts as well and would be supported by, again, the

18   documents taken off her when she was arrested in September of

19   2009.

20         Several times when the United States -- or excuse

21   me -- the defendant came to the United States he crossed into

22   the country here at the Peace Bridge in Buffalo.

23         Now, sometimes, however, he traveled directly from

24   Toronto to various cities in the United States.  Those places

25   are set forth in paragraph C, on page 3, and that places he

1    went to included Hawaii, Cleveland, New York City, Miami,

2    Tampa, Orlando, Washington, D.C., Boston, Atlanta and the other

3    cities set forth there.

4            Those trips, Your Honor, would be proven by what we

5    call TECS records, which is Treasury Enforcement Communication

6    Systems.  Those records, during this period of time, would show

7    when the defendant entered the United States, say, at the Peace

8    Bridge or when he traveled from Pearson Airport to various

9    locations in the United States.

10           Whenever someone leaves the United States and

11   crosses -- or crosses into the United States they are

12   inspected.  And that inspection is recorded in an electronic

13   database.  And that database shows the various entries by

14   Dr. Galea.

15           When the defendant and Ms. Catalano traveled

16   separately to the United States, Ms. Catalano ordinarily would

17   carry medical supplies based on a checklist that she prepared

18   at the defendant's direction.

19           The items that were set forth on that checklist and

20   included Nutropin, Actovegin, ATT (sic), ginseng, Celebrex and

21   some medical equipment including some IV tubing and a

22   centrifuge and the other items listed there.

23           The defendant and Ms. Catalano had an understanding

24   whereby if Ms. Catalano was asked her purpose for coming to the

25   United States she would say that she was attending a medical

1    conference.  In fact, on the majority of occasions that -- the

2    great majority of occasions that she and Dr. Galea came to the

3    United States they were not going to medical conferences, but

4    instead were going to treat patients within the United States.

5           And the items that Ms. Catalano would carry in for

6    the defendant included Nutropin and Actovegin.  These, Your

7    Honor, we would show to be misbranded drugs, because under the

8    Food, Drug and Cosmetic Act they had to be labeled in a certain

9    way.  And the substances brought in by Ms. Catalano did not

10   have the appropriate markings.

11          Sometimes they were -- in the case of Actovegin they

12   were labeled in foreign languages, which is an example of

13   misbranding under the Food, Drug and Cosmetic Act.  And also

14   Nutropin was not a substance that was permitted for giving the

15   kind of treatments that the defendant was giving to the

16   patients here.

17          In paragraph E -- subparagraph E of paragraph 4 of

18   the plea agreement we set forth the four different types of

19   treatments that Dr. Galea administered to patients within the

20   United States.  The first is referred to as an

21   anti-inflammatory IV.  And these were intravenous treatments

22   involving a mixture containing Actovegin.  Actovegin is a

23   substance derived from calf's blood.  Other items included in

24   that mixture were Adenosine Triphosphate, which is ATP,

25   Traumeel, magnesium, calcium, vitamins C, B, B-6 and

1    Glutathiome.

2         Next, the second treatment was a plasma-rich platelet

3    treatment which involved extracting blood from a patient,

4    spinning the blood in a centrifuge to separate the plasma from

5    red blood cells and then reinjecting the plasma into the

6    patients for the purposes of accelerating the healing process.

7         Third treatment was an injection containing

8    Actovegin, which is the principal ingredient in this one.

9    Again, it's described as an extract from calf's blood.  And

10   that was administered for the treatment of injured muscles.

11        The fourth treatment that the defendant from time to

12   time administered was injections containing a mixture of

13   substances that included Nutropin.  Nutropin is a human growth

14   hormone produced by recombinant DNA technology.  And there were

15   some other ingredients in that injection.  And the purpose

16   stated for that treatment was to treat joint inflammation.

17        Next, the defendant from time to time, while in the

18   United States, distributed and administered substances such as

19   ATP for intramuscular injections, and items used for these

20   injections were sometimes not labeled in English.

21        Prescription items distributed by Dr. Galea included

22   Nutropin and they did not bear that -- the symbol which is

23   prescribed by the Food, Drug and Cosmetic Act and the

24   regulations thereunder, the RX only symbol.  A substance that's

25   a prescription medication that doesn't have a symbol is

1   misbranded under the Food, Drug and Cosmetic Act.

2          And if -- also, any substance that is not labeled in

3   English is also misbranded under the Food, Drug and Cosmetic

4   Act.  Nutropin is a substance that is approved by the FDA but

5   not for the uses that the defendant used them for or

6   administered them on professional athletes for.

7          THE COURT:  What's the approval --

8          MR. CAMPANA:  The approved uses -- usages of

9   Nutropin, HGH, in the United States includes AIDS wasting,

10  cachexia, which is a condition caused by the AIDS virus.

11  Second would be short bowel syndrome.  Third would be human

12  growth hormone deficiency caused by usually a traumatic injury

13  to the pituitary gland caused -- sometimes caused by surgery or

14  other injuries, but not for athletic injuries or to heal

15  athletes.

16         The defendant administered the medical treatments in

17  the United States in such places as the homes of athletes or

18  hotel rooms.  And the expenses that the defendant incurred,

19  such as travel for himself or Ms. Catalano, were also charged

20  to the patients.

21         The billings that Dr. Galea charged over this

22  two-plus year period amounted to about $800,000.  The value of

23  the substances or the mixtures that contained the misbranded or

24  unapproved substances was not less than $30,000, but not more

25  than $70,000.

1           Most of this, Your Honor -- or all of this would be

2   proven by the testimony of Ms. Catalano, also what was seized

3   from her, which included a laptop computer, which had the

4   billing records.

5           To continue on page 6:  On August 27th of 2009, the

6   night -- the defendant and Ms. Catalano entered the United

7   States separately, traveled here separately.  And Ms. Catalano

8   crossed at the Peace Bridge and the defendant traveled to the

9   United States by air.  And the purpose of their travel was to

10  treat several athletes in the United States.  And Ms. Catalano

11  would testify to that as well.

12          On September 14th of 2009, that's the day

13  Ms. Catalano was arrested at the Peace Bridge, she attempted to

14  enter the Peace Bridge there and she was carrying -- or she

15  attempted to enter the United States there.  At the time she

16  had with her medical supplies.  She was on her way to

17  Washington, D.C. where she was to meet Dr. Galea.  And they

18  were going to meet for the purposes of treating a patient

19  there.

20          When Ms. Catalano was stopped at the border she made,

21  for a period of time, false statements concerning her purpose

22  in crossing into the United States.  And then subsequently she

23  admitted that she, in fact, was not coming to the United States

24  to attend a medical conference and to display these items at a

25  medical conference, but, in fact, she was traveling to the

1   United States to go from here, Buffalo, to Washington and to

2   meet Dr. Galea for the purpose of treating an athlete there.

3            THE COURT:  What drugs did she have on her

4   possession?

5            MR. CAMPANA:  She had -- again, she had some -- a

6   Nutropin bottle, Actovegin, ATP, ginseng and other medical

7   supplies.  The usual supplies that she carried into the United

8   States when she traveled here on Dr. Galea's behalf.

9            THE COURT:  Who were -- who was receiving these

10  drugs?

11           MR. CAMPANA:  Dr. Galea's patients were professional

12  athletes.

13           THE COURT:  Like who?

14           MR. CAMPANA:  We'd prefer -- we would -- their names

15  would come out at trial, Your Honor, but if --

16           THE COURT:  What would they come out with?

17           MR. CAMPANA:  Okay.  One -- some -- Tiger Woods was

18  one athlete.  He was a golfer.  Still is.  We have Takeo Spikes

19  was another patient and also Jamal Lewis.

20           THE COURT:  Who?

21           MR. CAMPANA:  Jamal Lewis.  And there were several

22  others, more than 20.

23           THE COURT:  More than 20?

24           MR. CAMPANA:  Yes.

25           THE COURT:  How did this network work?  How did

1    this --

2              MR. CAMPANA:  Your Honor, it appears that one athlete

3    was the first that Dr. Galea treated here in the United States.

4    And then he referred others -- other athletes recommended other

5    athletes to Dr. Galea.

6              THE COURT:  Okay.

7              MR. CAMPANA:  And, Your Honor, those facts would be

8    proven by the testimony of Ms. Catalano.  Again, the documents

9    that came off her laptop, which contained the invoices, would

10   be presented to the Court and that would be the proof in this

11   case.

12             THE COURT:  Do you understand all that, sir?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Okay.  If you have -- do you have any

15   questions about anything he just said?

16             THE DEFENDANT:  No, sir.

17             THE COURT:  No questions.  All right.

18             MR. CAMPANA:  Keeping in mind not every athlete got

19   every treatment.  Some got one treatment and not the other.

20             The sentencing guidelines apply --

21             THE COURT:  This was all for treatment?

22             MR. CAMPANA:  Yes.

23             MR. MAHONEY:  For injuries, Judge.

24             THE COURT:  Just one second.  I read something in

25   the -- I don't want to make this commercial.

1          Now, this paragraph 3 incorporates the first
2   paragraph by reference.  I didn't know that Cialis and Viagra
3   were --
4          MR. CAMPANA:  They're prescription.
5          THE COURT:  -- normally used for --
6          MR. CAMPANA:  They're prescription medications that
7   didn't bear the RX symbol on it.
8          THE COURT:  Okay.  Because I have them listed here
9   and when I saw that I didn't quite understand.  That's
10  certainly legal in the United States.
11         MR. CAMPANA:  Legal in the United States but can be
12  misbranded if not labeled properly.
13         THE COURT:  Okay.
14         MR. MAHONEY:  But not involved in our factual
15  statement.
16         THE COURT:  Right.  But Count 3 does incorporate
17  Count 1 by reference.
18         MR. CAMPANA:  It incorporates some of the paragraphs,
19  yes.
20         THE COURT:  Some of the paragraphs, okay.
21         MR. CAMPANA:  The base offense level we have is 6.
22  That's on page 7, paragraph 6, on account of the value of the
23  items administered and sold, which required government
24  regulations but did not receive it.  Based on that value
25  between $30,000 and $70,000, there's a six-level enhancement.

1              And then there are other enhancements set forth in

2     paragraph 8.  There was a two-level upward adjustment for being

3     a supervisor of criminal activity.  There's an --

4              THE COURT:  Let's go through this.  The offense level

5     is 6?

6              MR. CAMPANA:  Yes, plus 6 is 12.

7              THE COURT:  And 6 because of the -- of the

8     application note here.  Then there is another two-level because

9     of supervisor, he supervised --

10             MR. CAMPANA:  Ms. Catalano.

11             THE COURT:  Ms. Catalano.  And then there's a

12    two-level for abuse in special skills.  That's because he's a

13    doctor, I assume.

14             MR. CAMPANA:  Yes.  And then there's a two-level

15    upward adjustment for obstruction.

16             THE COURT:  I didn't hear anything in the facts that

17    would support obstruction.

18             MR. CAMPANA:  Well, the nature of the offense, Judge,

19    was to mislead, was to enter the United States repeatedly under

20    untrue pretenses, and that would prescribe or trigger the

21    application of the obstruction guideline.

22             THE COURT:  Where is that in the facts basis?

23             MR. CAMPANA:  In paragraph D, Your Honor.  It's

24    stated that the defendant and Ms. Catalano understood that if

25    Ms. Catalano were asked by U.S. border officers about the

1    purpose of her entry into the United States she would give a

2    false purpose.

3              THE COURT:  She what?

4              MR. CAMPANA:  Stating that she was going to go to a

5    medical conference.

6              THE COURT:  And that's the basis for the obstruction

7    of justice?

8              MR. CAMPANA:  Yes, yes.

9              THE COURT:  All right.

10             MR. CAMPANA:  Based on those facts, Your Honor, the

11   offense -- the total offense level appears to be 18.  The

12   adjusted offense level would be 18.

13             Reduced by three levels, if the defendant receives

14   the benefit of acceptance of responsibility, that would result

15   in a total offense level of 15.

16             THE COURT:  Acceptance of responsibility is a

17   provision that if someone's guilty of the offense -- and if

18   you're not guilty you have no business being here -- but if

19   you're guilty of the offense and you're willing to accept

20   responsibility for that, and by pleading guilty as evidence

21   that you are, the guidelines provide for a reduction of three

22   levels.

23             The provision being that if you save the government

24   the time and the expense of a trial, you should get a

25   recommended sentence that's lower than if you were to go to

1    trial.  Because if you went to trial and if you were convicted,

2    in all likelihood, this three-level reduction would not be

3    available to you.

4              Do you understand that, sir?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Okay.  There's no question it's an

7    incentive if you're guilty.  If you're not guilty, you have no

8    business being here.  Okay.

9              MR. CAMPANA:  As a result of that offense level and

10   what we believe to be a criminal history Category of I, the

11   sentencing range would be 18 to 24 months and a fine in the

12   range of $4,000 to $40,000.  Those would be the guideline

13   prescribed penalty ranges.  But the defendant is reminded that

14   the maximum penalties are set forth in paragraph 1.

15             THE COURT:  Do you understand that, sir?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Okay.

18             MR. CAMPANA:  The next paragraphs state that the

19   government and the defendant agree to those sentencing

20   guidelines calculations and the parties won't recommend any

21   other guidelines to be applied here.

22             The defendant does have the right to ask the Court to

23   impose a sentence outside the guideline range.  The government

24   will oppose that motion.

25             There were -- there is a section on the Statute of

1    Limitations that appears won't be applicable here.  But if, on

2    the other hand, the defendant's conviction is somehow

3    challenged successfully, and either on appeal or collateral

4    attack, then the government could reinstitute the charges

5    within a period of six months following the expiration of the

6    Statute of Limitations.

7              MR. MAHONEY:  Paul, did you cover 14?

8              MR. CAMPANA:  Excuse me?

9              MR. MAHONEY:  Did you cover 14?

10             MR. CAMPANA:  Yes.  We said that you have the right

11   to ask for a non-guideline sentence.

12             MR. MAHONEY:  Okay.  Thank you.

13             MR. CAMPANA:  On page 10, there's the defendant's

14   alien status.  Dr. Galea is not a citizen of the United States

15   and he's subject to the regulations and the policies of the

16   Bureau of Citizen and Immigration Services.  He's had a full

17   opportunity to explore the ramifications that his guilty plea

18   may have upon his status to enter the United States, and to be

19   within the United States, and to work here.  He's fully

20   discussed that with his attorney.  He's satisfied that his

21   guilty plea is in his best interest and that the effect on the

22   immigration status is a separate issue that would be determined

23   through the policies and procedures of the Department of

24   Homeland Security.

25             He further acknowledges that, because he's a citizen

1   of Canada who's charged in an indictment alleging that he's

2   committed crimes in the United States, the government may have

3   sought his extradition from Canada to stand trial here.  He,

4   however, has agreed to come to the United States voluntarily

5   for the purpose of entering this guilty plea without being

6   subject to extradition proceedings or any order of extradition.

7          Next, there was series of paragraphs on the

8   government's rights and reservations.

9          THE COURT:  Any reason to read that, Mr. Mahoney?

10         MR. MAHONEY:  No, Judge.  We understand that the

11  government has reserved a number of rights.

12         THE COURT:  Okay.

13         MR. MAHONEY:  And I've gone over them with Mr. --

14  with Dr. Galea.

15         THE COURT:  Okay.

16         MR. CAMPANA:  Next, at sentencing then the government

17  would move to dismiss the open counts of the indictments, that

18  would be Counts 1 and 2 and 4 and 6.

19         There are appeal rights, but those are limited

20  basically.  This is the defendant's day in court.  He waives

21  his right to appeal or collaterally attack any sentence which

22  is within that prescribed guideline range of 18 to 24 months

23  that's set forth in paragraph 12, regardless of how the Court

24  determines that sentence.

25         Should he appeal the -- his sentence, the government

1    reserves the right to argue the -- or if the government appeals

2    the sentence, the defendant could argue the correctness of the

3    sentence.

4             THE COURT:  This is what I talked about earlier,

5    that -- I'm not suggesting I'm going to do it, but if the Court

6    decided that a different sentence other than the guidelines was

7    appropriate, that I could do that.  And each side, depending on

8    whether I went higher than the guideline or lower, each side is

9    reserving the right to appeal.

10            Do you understand?

11            THE DEFENDANT:  Yes.

12            THE COURT:  And that --

13            MR. CAMPANA:  The --

14            THE COURT:  Well, anyway.  Go ahead.

15            MR. CAMPANA:  That's okay.

16            There's -- if the conviction is challenged by a means

17   other than appeal, which is Habeas Corpus, the defendant waives

18   that right as well, that he will not challenge it by what we

19   call a collateral attack upon the sentence, even if he does

20   discover or believes he's discovered additional facts that

21   would justify a decrease in his sentence.

22            And paragraph 24, the government waives its right to

23   appeal.  We would waive our right to appeal any sentence that

24   is within or above the guideline range set forth earlier in

25   this plea agreement at paragraph 12, regardless of how the

1   Court arrives at that sentence.

2         If the defendant, however, were to appeal from that

3   sentence, the government would argue that -- reserve the right

4   to argue that that sentence was correct.

5         We then have several paragraphs in the plea agreement

6   about cooperation.  The defendant agrees to cooperate fully and

7   provide truthful and complete information to the government

8   pursuant to the usual procedures that accompany our plea

9   agreements.  This cooperation shall be provided to all

10  authorities who agree to be bound by the agreement, and that

11  his obligation to testify truthfully applies in all proceedings

12  in any place.

13        In exchange for his plea of guilty and his

14  cooperation the defendant wouldn't be prosecuted by the U.S.

15  Attorney's Office for any other federal crimes committed here

16  and involving or related to the facts set forth earlier in the

17  plea agreement and the factual basis committed up to the day of

18  this agreement and about which he provides complete and

19  truthful information.  No testimony or statements could be used

20  against him if provided in compliance with this agreement.  And

21  any information learned therefrom, directly or indirectly,

22  wouldn't be used against Dr. Galea so long as it complies with

23  the agreement except, of course, if he doesn't comply and he's

24  prosecuted for perjury or for making false statements.

25        On the condition that he has fully complied with the

1   terms of the plea agreement, and should the government

2   determine that he's provided substantial assistance in the

3   investigation or prosecution of other persons, the government

4   would move the Court at sentencing to depart downwards by two

5   levels, pursuant to 5K1.1 and 5K2.0, on the grounds that he has

6   assisted the government and also by willing to appear here

7   voluntarily in the United States to enter this guilty plea and

8   not by -- and not requiring the extradition proceedings from

9   Canada.

10          THE COURT:  Mr. Campana, I understand the 5K1.

11          MR. CAMPANA:  Yes.

12          THE COURT:  Explain to me this 5K2 issue.

13          MR. CAMPANA:  That would be another basis for --

14          THE COURT:  Why do you have two of them?

15          MR. CAMPANA:  Because --

16          THE COURT:  5K1, I have to consider very carefully.

17   The other one I don't.

18          MR. CAMPANA:  You wouldn't, but we'd recommend that

19   you do.

20          THE COURT:  What difference does it make?  I don't

21   quite understand.

22          MR. CAMPANA:  You'd have two alternative bases, Your

23   Honor, for granting --

24          THE COURT:  Would it make any difference?

25          MR. CAMPANA:  If you accepted one and not the other.

1          THE COURT:  The 5K2, what does that add?  I don't

2     quite understand that.  I've never seen this before.

3          MR. CAMPANA:  I haven't either, because I never had a

4     defendant previously come here in waiving extradition and

5     saving the time.

6          THE COURT:  What does that add?  If you're asking for

7     a two-level reduction under 5K1 because of his cooperation,

8     what does this 5K2 do?

9          MR. CAMPANA:  Well, if he doesn't fully cooperate,

10    Your Honor, we are not bound to ask for any departure --

11         THE COURT:  I understand.

12         MR. CAMPANA:  -- from the sentence.  So then we

13    wouldn't ask you to give Dr. Galea any credit for waiving

14    the -- or for not requiring --

15         THE COURT:  Well, let's assume there's no cooperation

16    under 5K1.

17         MR. CAMPANA:  Then you go to --

18         THE COURT:  Then you go to 5K2.

19         MR. CAMPANA:  No, we wouldn't.

20         THE COURT:  5K2.

21         MR. CAMPANA:  We wouldn't.  We wouldn't be required

22    to --

23         THE COURT:  I still don't understand.

24         MR. CAMPANA:  We wouldn't be required to because he

25    wouldn't have complied with the plea agreement.

1      THE COURT:  What does 5K2 add or 5K2 period or 5K1

2  period, one without the other?  What does it add to the two

3  together?  What does that add to it?  That's what I'm having

4  trouble with.  It would seem like it would add a further

5  enhancement.

6      MR. CAMPANA:  If you were to -- for example, if you

7  were to believe that the cooperation was worth fewer than two

8  levels, but the agreement to come here without extradition were

9  worth an additional level, then you could grant him the two

10  levels.  It would give you an additional basis to impose a

11  lesser sentence.

12      THE COURT:  It's not asking for a greater increase?

13      MR. CAMPANA:  No.

14      THE COURT:  Okay.  Sir, 5K1.  Let's talk about that.

15      That basically is a provision that encourages people

16  to cooperate with the government, United States Government, to

17  enforce the laws of the United States.  It's been determined by

18  the Congress of the United States that it's a good thing to

19  cooperate and help the United States enforce its laws.

20      Now, some people don't like that.  Who cares what

21  they think?  They're irrelevant.

22      As a country, the United States has determined it's a

23  good thing.  It encourages people to help the government.  And

24  if you do, the government can make a motion that there be a

25  reduction based on the cooperation.

1          Once the motion's made -- you can't force the

2    government to make it; I can't force them to make it.  But if

3    they determine that the information is worthy of substantial

4    assistance they can make the motion.  And once they make the

5    motion, that triggers the adjustment.  And the Court can agree

6    or disagree with the number that the government's recommending.

7    That's up to me as to whether or not it would be an appropriate

8    number.

9          So, again, it's another -- and there are times when

10   this particular provision could have even greater consequences.

11   It doesn't apply here, but if there was a minimum sentence,

12   this provision would permit the government to go below -- or

13   the Court to go below the minimum that's required by statute.

14   So that doesn't apply here.

15         But the 5K1 is something that is there.  It

16   encourages people to assist the government.  If it is, you

17   could get a recommended guideline range that would be lower

18   than it would otherwise be.

19         Do you understand that, sir?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Okay.

22         MR. CAMPANA:  Thank you, Your Honor.

23         We then have the remaining paragraphs of the

24   cooperation section, which basically required the defendant to

25   cooperate fully and that if he doesn't cooperate fully, there

1    are consequences which was referred to earlier.  The government

2    then would be not bound by any of its promises in this plea

3    agreement.  And whether or not the defendant had breached the

4    plea agreement would be the subject of a hearing before this

5    Court.

6         Next, if I may, there's the forfeiture section of the

7    plea agreement.  The defendant has agreed to forfeit $275,000

8    prior to the date the Court sets for sentencing.  And he agrees

9    to be bound by these provisions which are set forth beginning

10   on page 19 and continuing through page 21.  I can go through

11   them seriatim or I can get to the last paragraph.

12         THE COURT:  Any reason to go through that in detail?

13         MR. MAHONEY:  No, Judge.  He understands those

14   provisions.

15         THE COURT:  Okay.

16         MR. CAMPANA:  Finally, on page 21, Your Honor, we

17   have the last numbered paragraph of the plea agreement which

18   states that this plea agreement here in writing is the total

19   agreement between the defendant and the government and that

20   there aren't any promises made by any -- by anyone other than

21   those contained in this agreement, and the agreement supersedes

22   any other prior agreements, written or oral, entered into.  And

23   there are none here.

24         Then there's my signature.

25         And on the following page, page 22, Dr. Galea

1    acknowledges that he's read the entire agreement, that he's

2    reviewed it with his attorney, Mr. Mahoney, and he's been able

3    to discuss it with him.  He agrees that it represents the

4    entire agreement reached between himself and the government and

5    no other promises or representations have been made to him,

6    that he understands all the consequences of his guilty plea.

7    And, finally, that he fully agrees with it.  And he's signing

8    the agreement and has signed it voluntarily and of his own free

9    will.

10             THE COURT:  Now, sir, we've gone over the agreement

11   in court.  You indicate you understand it.  Your attorney says

12   he's gone over it with you.  He's satisfied you understand it.

13   You signed it indicating you understand it.

14             Any questions?

15             THE DEFENDANT:  No, sir.

16             THE COURT:  Are these all the terms and conditions

17   that are set forth in this plea agreement?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  No one has made any other promises to

20   you, have they?

21             THE DEFENDANT:  No, sir.

22             THE COURT:  How old are you, sir?

23             THE DEFENDANT:  Fifty-one.

24             THE COURT:  And you were born and raised where?

25             THE DEFENDANT:  Toronto.

1          THE COURT:  And the extent of your education?

2          THE DEFENDANT:  I'm a physician, sports medicine.

3          THE COURT:  Where did you go to school?

4          THE DEFENDANT:  McMaster University in Hamilton.

5          THE COURT:  Okay.  And when did you graduate from

6     medical school?

7          THE DEFENDANT:  1986.

8          THE COURT:  Okay.  And what kind of practice do you

9     have?

10          THE DEFENDANT:  Sports medicine.

11          THE COURT:  Okay.  What does that mean to someone --

12          THE DEFENDANT:  Well, I look after the health care

13     needs, from kids to older people, that are involved in

14     recreational sports or any general activity or hobby.

15          THE COURT:  Okay.  Are you a sole practitioner?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And are you married?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  And do you have any children?

20          THE DEFENDANT:  Seven.

21          THE COURT:  Okay.  And what kind of hobbies do you

22     have?  What do you like to do?

23          THE DEFENDANT:  My favorite hobby is Biblical

24     archeology.

25          THE COURT:  Biblical archeology?

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  Do you do a lot of traveling?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Where have you traveled?

5           THE DEFENDANT:  Mainly to Jerusalem.

6           THE COURT:  Are you seeing a doctor for any reason

7     right now?  I don't want to get into any personal.

8           THE DEFENDANT:  I have a vocal cord disorder called

9     spasmodic dysphonia.

10          THE COURT:  Are you okay today?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Are you seeing a psychiatrist for any

13    reason?

14          THE DEFENDANT:  No.

15          THE COURT:  Have you ever been hospitalized or

16    treated for narcotic addiction?

17          THE DEFENDANT:  No.

18          THE COURT:  Are you presently today under the

19    influence of any drug, medicine or alcohol?

20          THE DEFENDANT:  No, sir.

21          THE COURT:  Mr. Mahoney, your client is obviously

22    very intelligent, appears to be alert, seems to understand

23    everything I'm saying, does not appear to be under the

24    influence of any drug, medicine or alcohol.

25          Is that consistent with your observations?

1          MR. MAHONEY:  You're correct, Judge.

2          THE COURT:  Now, sir, is anyone forcing you to plead

3    guilty to this charge?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  Anyone threaten you in any way?

6          THE DEFENDANT:  No, sir.

7          THE COURT:  Your willingness to plead guilty, you

8    discussed it with Mr. Mahoney, he discussed it with Mr. Campana

9    for the government.  Based on those discussions this plea

10   agreement was prepared and that's basically how this all came

11   about?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Now, do you understand, sir, the offense

14   here in which you are pleading guilty to is a serious offense,

15   and if it's accepted by the Court you'll be found guilty of

16   this offense, and there will be no appeal as long as the

17   sentence is consistent with the terms and conditions of the

18   plea agreement?

19         If, for some reason, the Court were to impose a

20   higher sentence and you disagreed with that, which I'm sure you

21   would, you could appeal that.

22         Do you understand that, sir?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Now, being found guilty of this offense

25   may deprive you of some rights.  You may be deprived of the

1    right of returning to the United States if you ever wish to in

2    the future.  You'd have -- well, that would be the one right

3    that you would lose.

4              Do you understand that, sir?

5              THE DEFENDANT:  Regrettably, I do.

6              THE COURT:  Okay.  Do you understand, sir, that you

7    have a right to plead not guilty to this offense and you have a

8    right to persist in that plea of not guilty, and you have a

9    right to a trial, a jury trial in this courtroom, where a jury

10   of 12 people will decide whether you're guilty or not guilty?

11             First of all, I'd be the judge and, to the best of my

12   ability, I would conduct the trial fairly and impartially.  I

13   have no interest in this case other than to make sure that you

14   and the government get a fair trial.

15             And in picking this jury, even though you're a

16   Canadian citizen, you'd have exactly the same rights that any

17   American citizen would have and that includes selecting a jury.

18   The fact that you're not an American citizen would play no --

19   would not be a factor at all.  And we would question the jury

20   to make sure that they understand that, that there's no

21   difference between an American citizen and any citizen from any

22   other country as far as a fair trial is concerned.

23             In selecting that jury we would bring in here

24   probably somewhere between 75 and 100 people who are on our

25   jury list.  Who are these people?  These are individuals that

1    live in this district.  They would be put in the courtroom.

2    They'd be in here.  You'd be in the courtroom.

3         They'd be put under oath.  I would ask them questions

4    about their fairness, their impartiality.  If there were anyone

5    in that group that would not be fair and impartial, that person

6    would be excused.  And you'd have input on that through your

7    lawyer.  You could say that one person has pretty much made up

8    their mind, I don't think they are going to give me a fair

9    trial.  And if you explain to me why and I agree with you, that

10   person would be gone.

11        You know, in life we meet a lot of people that give

12   you their opinions about a lot of things.  And a lot of these

13   people haven't got the foggiest idea what they're talking

14   about.  But they're so smart they're going to give you their

15   opinion whether you want to hear it or not.  Well, they'd be

16   gone, because they're so smart they don't need any trial.

17        That's isn't the way the system works, okay.  We have

18   a trial where the jury verdict has to be based upon the

19   evidence and the law and not based upon someone's personal

20   opinion of what they think the law could be or should be, or

21   whatever they feel.  And there are people that -- they'd be

22   gone.  And you'd be able to get a good feel for these

23   individuals because the questioning would go on for a good

24   portion of a full day.

25        Also, you'd have a right to remove up to ten

1    individuals for any reason you want, other than race or gender.

2    You couldn't say, I don't want any women on my jury; you

3    couldn't say I don't want any minorities on my jury, or women

4    on my jury, or men on my jury.  You can't do that.  You can't

5    discriminate in any way at all in the jury selection process.

6            But you have a right to remove up to ten individuals

7    for any other reason that you feel you just don't -- something

8    about that person, I just don't think that person's going to

9    give me a fair trial.

10           Do you understand that, sir?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  Mr. Mahoney would represent you during

13   the trial.  You'd have a right to hear and see all the

14   witnesses and have Mr. Mahoney cross examine all the

15   government's witnesses.  And after the government's rested its

16   case you could put on a defense.  You could subpoena witnesses

17   or any records that are relevant to the trial issues.

18           But you don't have to do a thing.  You have no burden

19   at all.  The burden is on the government to prove beyond a

20   reasonable doubt that you are guilty of this offense, and that

21   has to be to the satisfaction of all 12 jurors.

22           Do you understand that, sir?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  In other words, you can sit there and you

25   can say, I'm not putting on any proof, I'm going to rely on the

1    presumption of innocence.  And we'll have gone over all that

2    with the jury during jury selection.  And they will also be

3    instructed on this and they'll have to follow the law because

4    they'll be under oath.

5            And in the jury selection process we will go over the

6    fact that an indictment is not any evidence, that there's a

7    presumption of innocence.  The government has the burden of

8    proving beyond a reasonable doubt each and every element of the

9    crime charged.

10           Do you understand -- these are rights that you have.

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  Do you understand that, sir?

13           By entering a plea of guilty, if accepted by the

14   Court, there will be no trial.  You'll have waived your right

15   to trial, as well as all the other rights we talked about.

16           Do you understand all that, sir?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Any questions?

19           THE DEFENDANT:  No, sir.

20           THE COURT:  Counsel, do you know any reason why I

21   should not accept the plea in this case?

22           MR. CAMPANA:  No.

23           THE COURT:  Mr. Mahoney?

24           MR. MAHONEY:  No, Judge.

25           THE COURT:  Are you both satisfied I complied with

1    all the requirements of Rule 11?

2              MR. CAMPANA:  Yes.

3              MR. MAHONEY:  I agree, Judge.

4              THE COURT:  Sir, how do you plead to Count 3; guilty

5    or not guilty?

6              THE DEFENDANT:  Guilty.

7              THE COURT:  It is the finding of the Court that the

8    defendant is fully competent and capable of entering an

9    informed plea.  His plea of guilty is a knowing and voluntary

10   plea supported by an independent basis in fact containing each

11   of the essential elements of the offense charged.  His plea is,

12   therefore, accepted and he is now judged guilty of Count 3.

13             Sentencing will be scheduled for October 19th at

14   12:30.  A written presentence report will be prepared by the

15   probation office to assist the Court in imposing sentence.

16   You'll be afforded an opportunity to meet with the probation

17   officer to provide information in that report.  Your attorney

18   should be present.

19             Mr. Mahoney, did you arrange to do that today?

20             MR. MAHONEY:  Mr. Ball is here, Judge, and we're

21   going to go see him briefly today.  And we tried to get it a

22   little earlier but the timing wasn't right.  So we'll met with

23   Mr. Ball today and he and I will set up a further time.

24             THE COURT:  Well, he'll be here all day and night if

25   necessary.

1          MR. MAHONEY:  Well, there's so much --

2          THE COURT:  Up to you.

3          MR. MAHONEY:  Yeah.  There's so much information,

4    ultimately, that he's going to have that today we'll do the

5    preliminary discussions and we've already talked about setting

6    something up later on.

7          THE COURT:  Whatever you wish, Mr. Mahoney.

8          You'll receive a copy of the report as well as your

9    attorney and the government.  You and the government will be

10   able to provide any additional information, any objections, any

11   motions that are consistent with the terms and conditions of

12   the plea agreement.

13         And both you and your attorney will have an

14   opportunity to address the Court at the time of sentencing and

15   say anything you wish to say in mitigation of the sentence.

16         The scheduling for filing all papers and motions will

17   be as follows.

18         THE CLERK:  The initial presentence report will be

19   due September 6th.  The statement of the parties with respect

20   to sentencing factors and objections, if any, and motions, if

21   any, including the Government's 5K1.1 motion, any notice by the

22   government not to file a 5K1.1 motion, or any motion by the

23   government for an extension of time to file a 5K1.1 motion will

24   be due September 28th.  The defense notice of the government's

25   failure to file a 5K1.1 motion will be due October 3rd.

1  Responses to any objections or responses to any motions will be

2  due October 5th.  Any motion to adjourn the sentencing date

3  will be due October 11th.  The final presentence report will be

4  due October 12th.  And any character letters and/or sentencing

5  memorandum in support of the defendant will be due

6  October 12th.

7          THE COURT:  As far as bail, Mr. Campana?

8          MR. CAMPANA:  Your Honor, the pretrial services

9  officer has recommended that Dr. Galea be released on his own

10  recognizance.  We agree and just would ask that the only other

11  term be that he comply fully and completely with the terms and

12  conditions of the plea agreement.

13          THE COURT:  Do you understand that, sir?

14          THE DEFENDANT:  Yes, sir.

15          MR. MAHONEY:  And, Judge, in that regard, the -- I

16  believe the recommendation is to have no travel restrictions

17  also.

18          THE COURT:  Yeah, there are none.

19          MR. MAHONEY:  That's right.

20          THE COURT:  He'll be released on his own

21  recognizance.

22          MR. MAHONEY:  Yes.

23          THE COURT:  That's it.  So there are no restrictions.

24  Thank you.

25          MR. CAMPANA:  Thank you.

1          MR. MAHONEY:  Thanks, very much, Judge.

2      (Proceedings concluded at 4:07 p.m.)

3               *    *    *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3           I certify that the foregoing is a correct

4    transcription of the proceedings stenographically recorded by

5    me in this matter.

6

7

8                                    S/Yvonne M. Garrison, RPR

9                                    YVONNE M. GARRISON, RPR
                                     Official Reporter
10                                   U.S.D.C., W.D.N.Y.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25