1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
2

3    UNITED STATES OF AMERICA,    *        Docket No. 10-CR-307
                                  *
4                                 *
                                  *
5                                 *        Buffalo, New York
               v.                 *        December 16, 2011
6                                 *        1:01 p.m.
                                  *
7    ANTHONY GALEA,               *
                                  *
8              Defendant.         *
                                  *
9    * * * * * * * * * * * * * *  *

10                  TRANSCRIPT OF SENTENCING
11        BEFORE THE HONORABLE RICHARD J. ARCARA
                UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

     For the United States:    PAUL J. CAMPANA, ESQ.
16                             Assistant United States Attorney

17

18
     For the Defendant:       MARK J. MAHONEY, ESQ. and
19                            BRIAN H. GREENSPAN, ESQ.

20

21

22
     Court Reporter:          YVONNE M. GARRISON, RPR
23                            Official Court Reporter
                              U.S.D.C., W.D.N.Y.
24                            2 Niagara Square
                              Buffalo, New York 14202
25                            716-861-7568

1              THE CLERK:  Criminal Action 2010-307A, United States

2    versus Anthony Galea, sentencing.

3              Counsel, please state your name and the party you

4    represent for the record.

5              MR. CAMPANA:  Paul Campana for the United States.

6              MR. MAHONEY:  Judge, Mark Mahoney for Dr. Galea, and

7    also --

8              MR. GREENSPAN:  Brian Greenspan for Dr. Galea as

9    well.

10             THE COURT:  All right.  Mr. Greenspan, I guess we

11   admitted him the last time we were here.

12             MR. MAHONEY:  Yes, Judge, he's been admitted.

13             THE COURT:  Are we ready?

14             MR. CAMPANA:  We are.

15             THE COURT:  Mr. Mahoney?

16             MR. MAHONEY:  Yes.

17             THE COURT:  The defendant, Anthony Galea, stands

18   before the Court for a sentencing on his previous plea of

19   guilty to one count of introducing misbranded drugs into

20   interstate commerce with intent to mislead an agency of the

21   United States in violation of Title 21 United States Code

22   Section 331(a) and 331(a)(2).

23             I know that counsel have reviewed the report, and I

24   assume you've gone over it with your client, Mr. Mahoney.

25             MR. MAHONEY:  Yes, Judge.

1          THE COURT:  The Court hereby accepts the terms and

2     conditions of the plea agreement and the plea of guilty.  I

3     will now place the presentence investigation report in the

4     record under seal.

5          If an appeal is filed, counsel on appeal will be

6     permitted access to the sealed report, except that counsel on

7     appeal will not be permitted access to the recommendation

8     section.

9          The parties have filed the appropriate statement of

10    parties with respect to sentencing factors.  I have carefully

11    reviewed both the parties' statements with respect to

12    sentencing factors, and have carefully considered both the

13    parties' submissions, additional facts and circumstances that

14    have been presented for the Court's consideration.

15         There is -- the parties do have some disagreement as

16    to what the Court should consider and the weight that the Court

17    should give to various circumstances in imposing a sentence.

18    And I find that they are quite different, put in a different

19    light by the government as well as the defendant.

20         On the one hand, the defendant contests the absence

21    of much allegedly mitigating information in the presentence

22    report; and on the other hand the government alleges the

23    defendant is affirmatively misleading the Court by downplaying

24    the seriousness of the offense of conviction.  The government

25    does stop short of asking the Court to declare the defendant is

 1    in breech of the plea agreement.  The Court has some concerns

 2    as well, and despite the highly extraordinary volume of

 3    submissions the parties have provided to the Court, I would

 4    like to address a couple of matters.

 5           First, it is the propriety of the two-level upward

 6    adjustment for the obstruction of justice pursuant to Guideline

 7    Section 3C1.1.  The parties have agreed that -- well, the

 8    parties have agreed in the plea agreement that the defendant

 9    made false statements to border officials and that he directly

10    caused Ms. Catalano to make false statements to border

11    officials to disrupt the border inspection process so that the

12    drugs could be entered into the United States.  But it's not

13    clear to me that the facts establish about the false statements

14    to obstruct the border inspection process will support the

15    concrete and specific findings that the Court is required by

16    law to make in order to justify the imposition of the sentence

17    enhancement for obstruction of a criminal investigation

18    pursuant to 3C1.1 of the guidelines.

19           Mr. Campana, I'm sure you agree with me that there is

20    an element of criminal defense of dispensing misbranded drugs

21    that the defendant has admitted that he acted with intent to

22    defraud an agency of the United States.  And the parties

23    detailed in the factual basis paragraph of the plea agreement

24    that you have then stressed in your presentence submissions

25    evidence of a series of false statements that the defendant

1    made at the international border at the airport in Toronto and

2    caused Ms. Catalano to make -- to make partly because of the

3    evidence of conduct was necessary to prove beyond a reasonable

4    doubt that the defendant acted with knowledge and the intent to

5    deceive an agency of the United States.

6           In light of that, two those factors, first, if the

7    false statement properly understood as evidence and intent to

8    defraud an agency of the United States are proof of the

9    underlying offense, were they not taken into account in the

10   base offense level prescribed by the sentencing commission that

11   applies to misbranding offense of conviction -- the offense of

12   conviction.

13          Second, if you look at application note 5(B) to the

14   guidelines Section 3C1.1, which lists among examples of types

15   of conduct not ordinarily to be treated as obstruction for

16   purposes of 3C1.1 in which it lists making false statements not

17   under oath to law enforcement officers unless the statement

18   obstructs or impedes the official investigation or prosecution

19   of the instant offense.

20          Now, federal courts in applying the guidelines have

21   imposed long sentences in federal prison upon drug smugglers

22   convicted under Title 21 who did not receive this enhancement

23   even though they made false statements at the international

24   border.

25          The false statements here preview within the

1    heartland of the base offense level guideline in obstructing

2    the border inspection process does not appear to be destruction

3    of the criminal investigation in the instant offense.

4         Now, there's a two-level adjustment here for the

5    obstruction of justice.  I'd like an explanation on that.

6         MR. CAMPANA:  Yes.

7         THE COURT:  It appears to me that there's some issue

8    here as to whether or not that's a proper adjustment.

9         MR. CAMPANA:  Yes.  It's being raised here for the

10   first time.  And what I would point out is that the plea --

11        THE COURT:  We have many cases, Mr. Campana, where

12   individuals come in the country carrying some kind of

13   contraband and make a false statement at the border, yet I'm

14   not aware of those false statements ever being used as an

15   obstruction of justice adjustment.

16        MR. CAMPANA:  Usually though, Judge, if I may

17   respond, is that the plea is to a discrete, or in those

18   circumstances, there's only one event and the person pleads

19   guilty to that event and there's no other relevant conduct.

20        Here Count 3 charges this conduct on one day.  It

21   occurred on a single day as charged.  However, the relevant

22   conduct reaches back to a pattern of conduct over a couple of

23   years where there's repeated misstatements and there's a

24   conspiracy between Dr. Galea and Ms. Catalano.

25        THE COURT:  That's not what he pleaded guilty to

1   here.

2               MR. CAMPANA:  But he admitted it in his relevant

3   conduct.

4               THE COURT:  Okay.

5               MR. CAMPANA:  And in the factual basis.

6               And because of that, or on account of that, the

7   probation officer properly invoked the application note to

8   reflect the obstruction that's implicit in those repeated

9   events.

10              THE COURT:  So you're saying it comes from the

11  conspiracy that was admitted even though that wasn't the --

12              MR. CAMPANA:  The plea wasn't to a conspiracy.

13              THE COURT:  I'm sorry?

14              MR. CAMPANA:  The plea was not to a conspiracy.

15              THE COURT:  Right.

16              MR. CAMPANA:  But the relevant conduct admitted shows

17  a pattern of deception which the application note accounts for

18  in which the probation officer properly cited in the report.

19              So this violation could occur --

20              THE COURT:  Was it the repeated activity or was it

21  the fact that he admitted to the conspiracy?

22              MR. CAMPANA:  The obstruction is not based only upon

23  one event.  There would have been a sufficient basis to convict

24  Dr. Galea if the only fact we had was the border crossing on

25  that particular day.  But, in fact, there was other relevant

 1      conduct to which Dr. Galea admitted which was set forth in the

 2      factual basis.  That represented a pattern of misleading,

 3      defrauding the government at the border, coming here under

 4      false pretenses, a way of committing this offense that is not

 5      typical, but which Dr. Galea admitted to.  And on that basis,

 6      that application note was cited and properly, we think, to

 7      apply this adjustment.

 8              It wasn't simply what happened at the border that

 9      day.  It was a pattern of conduct that occurred from July at

10      least of 2007, and persisted to September 14th, 2009.

11              THE COURT:  Well, Mr. Mahoney, in your submission you

12      made statements on behalf of your client that may put the

13      acceptance of responsibility in doubt.  You indicated in your

14      statement at page 10 you say that it is noted Dr. Galea did not

15      believe that there was anything wrong with bringing in the

16      medicines involved in the case.

17              That statement could very easily be interpreted as a

18      post plea denial of intent to deceive the element of the

19      offense of conviction sufficient to deny him the two-level

20      acceptance of responsibility adjustment.  I'm a little

21      concerned about that statement.

22              MR. MAHONEY:  Well, Judge, there's a difference

23      between the question of the medicines in themselves, that is

24      whether or not, for example, Nutropin or Actovegin were

25      permitted to come in the country.  That would be inconsistent

1    with the mislabelling offense that's misbranding.  And

2    misbranding has nothing to do with the actual nature of the

3    substance, but has to do with the labelling of it.  So it

4    really isn't part of the plea.

5              The plea doesn't really relate to the

6    inadmissibility, if you will, of any of the medicines to come

7    into the U.S.  They have strictly to do with the labelling, but

8    we put that in there not because it counters complete

9    acceptance of responsibility for the offense he's pleading to

10   and more -- clearly he agrees he did much more that was

11   wrong -- we put that in there to sort of balance out the

12   background concerns about some of the substances, specifically

13   Nutropin as being associated with performance enhancement which

14   categorically was not.  And to try to put into context his

15   belief based on, see, what was happening in the U.S. with the

16   use of that medicine, that it would have been proper to bring

17   the medicine in but that doesn't at all undercut the acceptance

18   of responsibility for the labelling violation that occurred by

19   bringing in medicine that has a label that does not conform to

20   the regulations.

21             THE COURT:  Mr. Campana.

22             MR. CAMPANA:  Your Honor, I had been concerned with

23   that issue too, but I note that first we did agree to -- to the

24   mitigation.  But in the more recent submissions I think

25   Dr. Galea has himself taken responsibility especially in what

1    was filed yesterday, a letter personally from him to the Court.

2           We think that that, taken together with everything

3    else, especially since he states his remorse for putting

4    Ms. Catalano in harm's way, we think that in practical terms he

5    has accepted responsibility, although I had been concerned with

6    the earlier submissions that we believed and have said unduly

7    minimized the conduct.

8           MR. MAHONEY:  And, Judge, I would say probably will

9    never do enough to try to draw the distinction between the

10   arguments that counsel make regarding some of the finer points

11   here and the underlying feelings about the defendant who has

12   not only made his plea before Your Honor, has cooperated with

13   the government, and he has expressed to us and in the letter --

14   the letter he had sent to you -- we delivered to you -- really

15   reflects what he's been saying all along.  His real take is on

16   this is, not necessarily reflected the in the lawyerly

17   discussion about the finer points of what the implications are

18   of the details behind this plea.

19          THE COURT:  All right.  I carefully read all the

20   submissions of the parties and the presentence report and the

21   Court will be adopting the facts in the report as its findings

22   of fact and incorporate them in the record.

23          I know that you take issue with some of the

24   statements that's in the record.  Those submissions are part of

25   the record.  And if any further discussion, they're available,

1    but I'm not going to change the presentence report.

2          There are no objections to the probation officer's

3    conclusions as to the applicable guidelines.   The report

4    recommends that the base offense level under Guideline

5    Section 2N2.1(c)(1), and 2B1.1(a)(2) is 6.

6          The report also recommends a six-level upward

7    adjustment pursuant to 2B1.1(b)(1)(D) as the payments for goods

8    and services require government regulation but did not exceed

9    $30,000, but was less than $70,000.

10          The report also recommends a two-level upward

11   adjustment pursuant to 3B1.1(c), as the defendant was an

12   organizer, leader, manager or supervisor in criminal activity.

13          The report also recommends a two-level upward

14   adjustment pursuant to 3B1.3 as the defendant used a special

15   skill in a manner that significantly facilitated the commission

16   of the offense.

17          The report also recommends a two-level upward

18   adjustment pursuant a 3C1.1 that he in -- the report recommends

19   a two-level upward adjustment pursuant to 3C1.1 as the

20   defendant willfully or impeded or attempted to obstruct, impede

21   the administration of justice.

22          The Court will not impose the obstruction of justice

23   enhancement in this case on the grounds that contrary to the

24   government's position today, that the false statement was not

25   made under oath, it was made to border inspectors, were not

1    made in the course of the official criminal investigation and

2    did not obstruct the official criminal investigation.

3          The report also recommends a three-level downward

4    adjustment for acceptance of responsibility.  I will accept

5    that and will calculate the offense level of 13, criminal

6    history category I with an advisory range of 12 to 18 months.

7          However, the government has also filed a motion for a

8    two-level departure under 5K1.1 for substantial assistance in

9    the investigation and prosecution of others who may have

10   committed offenses, and pursuant to 5K2.0 due to the

11   defendant's waiver of extradition and voluntary surrender in

12   the United States to enter into the plea agreement.

13         The Court will grant the request for the two-level

14   downward departure pursuant -- as I just indicated.  This puts

15   us at offense level 11, criminal history category of I, with an

16   advisory guideline range of eight to fourteen months.  The

17   advisory range for supervised release remains at one year.  The

18   advisory range for a fine is 2,000 to $20,000, plus the cost of

19   imprisonment and supervised release.

20         In accordance with the Supreme Court decision U.S.

21   versus Booker and the Second Circuit decision U.S. versus

22   Crosby, this Court must consider the guidelines but is not

23   bound by them.  The Court must also consider the factors set

24   forth in 18 U.S.C. 3553(a).

25         Now, I have received, according to my count, it was

1    about 123 letters.  I might add made my life last night quite

2    late trying to go through all these letters, and I read every

3    single one of them.  I note that there was -- I didn't receive

4    any letters -- I'm not saying there should have been any

5    letters -- from any active professional athlete.  I take this

6    as not any sign of lack of support for the defendant, but I do

7    conclude that it may reflect the desire to avoid potential

8    controversy and notoriety.  As I stated, I considered all the

9    filings of the parties.

10           The letters -- I've been a judge for 23, 24 years and

11   I receive letters, that number in the past, but I think that

12   kind of really impressed me so much was the variety of the

13   letters, who they came from:  Peers, patients, every day

14   patients, not the so-called -- I guess there's one hockey

15   player that commented but most of the individuals just everyday

16   citizens who just work very hard.  They certainly are a

17   testament to what this doctor has done over the years.  It's

18   unfortunate that he finds himself in this situation today, but

19   he's got no one to blame but himself.

20           All right.  Mr. Mahoney.

21           MR. MAHONEY:  Thank you, Judge.

22           As you have anticipated, I'm sure, Mr. Greenspan and

23   I are going to sort of split up our presentation.  I just want

24   to address in my own way the question of a non-guideline

25   sentence and some of the factors that have build into that, and

1   then Mr. Greenspan will sort of address the area of which is

2   more covered, say, in the letters from friends and family and

3   patients and so on.  I'll to be -- kept it very brief and I

4   know he will as well.  Although I've assured both him and

5   Dr. Galea the Court makes it clear that it's not in a rush to

6   get through this sort of thing.

7              And also, Your Honor --

8              THE COURT:  You're not going to read the 123 letters.

9              MR. MAHONEY:  No, no.

10             THE COURT:  Thank you.

11             MR. MAHONEY:  And, you know I, just want you to know

12  that I was asked:  Well, is the judge going to read all these

13  letters; and based on my experience with you, I told him

14  without any hesitation that you read every one of these letters

15  and that you have commented more than once on how often you get

16  useful and important information from these letters that help

17  round out the picture of the person who appears before you.

18  And I -- and I -- it's already evident that that's the case

19  here.

20             I just wanted to, Judge, let you know who is -- there

21  are a number of people here in the courtroom that I think it's

22  helpful to the Court to know who is attending.  To both of

23  Tony's parents Joseph and Francis are here, his sister Janet,

24  Janet Kermy (phonetic) is here, his nephews are here, his

25  wife's father, Zorn Bovanovich (phonetic) is present, his

1    sister-in-law Nina Bovanovich is here.

2            Your Honor, you may recall -- I'm sure you recall a

3    particular letter from Stacy Sharon from Atlanta, the woman

4    who -- whose basically life was changed by Tony's efforts.  She

5    was disabled with chronic pain with conditions that other

6    doctors were not able to help her with.  And she tells the

7    story, and what I think is probably the best letter I think

8    I've ever seen submitted on behalf of a defendant about how he

9    has changed her life.

10           She is here with her parents today from Atlanta,

11   Judge.  Mark McCoy is Tony's business partner.  He was an

12   Olympic gold medalist '92 Barcelona games.  He was a patient,

13   best friend.  Jennifer Ruppel (phonetic) is a family friend.

14   You mentioned the hockey player, Ty Domi is here in the

15   courtroom today following up on his letter to the Court.  Mark

16   Lindsay (phonetic) who's a highly regarded, well-known

17   chiropractor in the world of sports medicine is present.  His

18   good friend and patient came in, Damian Dodd (phonetic) is

19   here, Jeff Dyer (phonetic) is a patient who flew in from Los

20   Angeles to be here, Bess and Jacob Bauer (phonetic) two family

21   friends, and John Chism (phonetic), and other patients.

22           And I just want you to know Mr. Greenspan reminded me

23   today that they actually discouraged people from coming down to

24   the courthouse today.  This isn't a demonstration for Your

25   Honor's benefit.  It just was an indication that these are

1    people that are -- care very much.

2            Oh, I'm sorry, of course his wife Nella is present as

3    well, Judge.

4            THE COURT:  I note that his ex-wife actually wrote a

5    letter too.

6            MR. MAHONEY:  We could only hope, many of us do, that

7    we would have that kind of support.

8            Well, I'll try to not extend things too much what I

9    have to say.  But, you know, in our presentation to you, Judge,

10   we could have pretended that this is a simple case of

11   misbranding and a 331 violation, and looked at it strictly that

12   way.

13           And I think Mr. Campana is correct to point out it's

14   a multifaceted case.  There are a lot of issues behind it.  The

15   plea agreement is compromised in many ways.  And there's --

16   there is the larger picture that we tried to address.  And some

17   of that was because there was a lot of sensational and false

18   media reports in connection with his arrest quite predictably

19   given the kinds of patients that Dr. Galea has had which refer

20   to things like performance enhancement and doping.  And I just

21   thought it important that we made it clear -- the government's

22   also made it very clear that's not what this case is about,

23   that's not what Dr. Galea has ever been about.  He's been into

24   exclusively on healing injuries for patients using the best and

25   most advanced means.

1            THE COURT:  Some of the drugs were enhancements,

2    weren't they?

3            MR. MAHONEY:  No.

4            THE COURT:  They were used for healing purpose.

5            MR. MAHONEY:  Absolutely.

6            THE COURT:  But they were used in other, I guess --

7    used in some other capacity.  Somebody else may use them for a

8    different purpose.

9            MR. MAHONEY:  Exactly.

10            THE COURT:  But there's no evidence that I saw that

11    it was used in this case.

12            MR. MAHONEY:  No.  And the government's never

13    suggested it, and I think they made it clear, as we do.

14            THE COURT:  Well, the letters and again, I'm not

15    going to speak on your behalf, Mr. Mahoney, it seems like his

16    main goal as a physician is to be a healer.

17            MR. MAHONEY:  That's his dedication, Judge.

18            THE COURT:  I think I've seen that word countless

19    times in all those letters from various people.

20            I'm sorry.  I didn't mean to interrupt you.

21            MR. MAHONEY:  No, that's fine.

22            And one comment I should make, we avoided naming

23    particular patients for the -- generally for the most part

24    because there are privacy concerns in terms of him revealing

25    treatments to patients.  So that's one of the reasons why we

1   don't really have a -- you know, identified individual patients

2   and the treatments that they've had, but we went to some effort

3   to outline for you what kind of treatments really are at issue

4   here and maybe in detail.  I'm certainly not going to go over

5   now but just try to inform you of what all this was about.

6          But obviously this is a case that involves sort of an

7   extreme kind of contrast.  You know, we have a person about

8   whom so many positive things can be said and have been said,

9   who is a truly good person, a truly outstanding physician, and

10  we have all the support in the world for that and he has his

11  own record and his achievements for individual patients to

12  attest to that.  But in the midst of this, to contrast with

13  that, we have somebody who partly because of it, because of his

14  dedication to his patients and his single-mindedness in that

15  regard made some terrible choices which he not only regrets but

16  he's acknowledged were wrong about which he's very embarrassed

17  today.

18         And, luckily, none of this was consequential for him.

19  Nobody was hurt, nobody was intended to be hurt, people were

20  healed, good things were done.  But in order to do that, he

21  disregarded very important and significant rules, not just at

22  the border, but rules in terms of what substances and

23  treatments are permitted and licensing requirements for

24  physicians.

25         And what began as, I think, an innocent, although

1    partly maybe more naive effort, to accommodate some patients

2    who weren't able to travel to Canada, almost all of his

3    patients were established patients at his clinic in Toronto,

4    but there were occasions where, for various reasons, patients

5    asked him to come to see them here in the United States, and it

6    became a slippery slope for him.

7         He made efforts to try to figure out the licensing

8    requirements, and actually it's fairly simple in one sense.  A

9    physician from Canada is entirely permitted in every state to

10   provide treatment to somebody in the United States whether

11   they're a preexisting patient or not, if they work under the

12   supervision of a physician licensed in that state.

13        And there were initially efforts to comply with that,

14   but it became something that just did not fit the urgency, the

15   traveling schedule, and he was not exiguous -- was not exiguous

16   about it and was careless.  He made efforts to actually get

17   licensed in the United States in Colorado and people were

18   helping him with that.  It didn't happen quickly enough.

19        He made efforts to get associated with a clinic in

20   the U.S. and, you know, on paper that was happening, but it

21   didn't happen quickly enough.  He made efforts to get a visa, a

22   proper visa, which he'd be eligible for, clearly an O-1 visa

23   where he'd be able to come into the country for the specific

24   purpose of providing these kind of medical treatments, but

25   he -- his activities, though, took him beyond that and it was

1    something which I think essentially got out of hand.  He was

2    unable to say no to patients because he knew he could help them

3    and others couldn't.  And experienced, I think, an increasing

4    anxiety over the fact that he was not in compliance with these

5    rules and was giving into his need to take care of these

6    patients.

7             THE COURT:  Well, he considered himself above the

8    law, Mr. Mahoney?

9             MR. MAHONEY:  I think -- obviously that's an easy way

10   to characterize this.  I think it was more of an naivety,

11   Judge, with an arrogance that he felt his mission was -- it was

12   so important to him, and healing was so important to him that,

13   you know, on -- it may be on the same scale, you know, we're

14   familiar with people crossing the border and being -- saying

15   they're going to the mall because they don't want to say that

16   they're going to the strip club.  This is quite a different

17   kind of thing.  But I think it's more on that level than

18   somebody who felt he was above the law because in many -- which

19   is maybe why I put in our sentencing memorandum some of the

20   finer points about why he would have thought that Nutropin was

21   permissible, these treatments were permissible in U.S.; not to

22   quibble but to say, yes, there's this aspect of acting above

23   the law, but I don't think it was an arrogance.  I think it was

24   a -- a subduing those concerns to -- in giving preference to or

25   giving focus on the immediate problem of a patient who was in

1    some need where they couldn't come to Toronto and needed his

2    assistance, and putting it aside -- the concern aside about the

3    regulations.

4            I can't argue too much with -- acting above the law.

5    He certainly acted that way.  But I think in trying to

6    understand the mentality, I think it's merely that the

7    situation got out of hand.

8            THE COURT:  Well, he made quite a large number of

9    trips.

10           MR. MAHONEY:  I know it got -- that's what I mean by

11   saying it was a slippery slope.  He got started on this and was

12   not -- and he should have -- he knows now how not only foolish

13   it was, how wrong it was, and he has agonized over this, Judge,

14   not just because of the trouble it's caused him, but because he

15   realizes it doesn't even -- it's not even consistent with his

16   own moral code, it's not professional, and it's the hugest

17   embarrassment to him.

18           It's difficult -- it's very difficult.  You know,

19   he's acknowledging this publicly.  It's a very difficult thing.

20   But from the very outset in my first meetings with him, it's

21   been evident to me that it weighed on him heavily that he made

22   such bad choices.  And he, of course, with good intentions

23   rather than the legal intentions, but he realizes fully that

24   that's just not an excuse, doesn't justify what he did, and

25   he's embarrassed to the extreme.

 1          THE COURT:  And he brought another person involved

 2    here.

 3          MR. MAHONEY:  Yes, Judge.  And I have to say, you

 4    know, from the very outset also, this is the first sort of

 5    public forum for this, but he knew this and it weighed on him

 6    heavily.

 7          THE COURT:  I was waiting to see whether there was

 8    going to be any acknowledgment on what harm he caused that

 9    young lady who is his assistant who's now a felon under the

10    laws of the United States.  And she appeared in front of me.  I

11    gave her one year probation.  She appeared to be about as sweet

12    of a person as you can ever imagine.  And this obviously has

13    changed her life dramatically.  And she had so much confidence

14    and trust in the doctor that she did what she was told, and now

15    she's got to live with the felony conviction of the laws of the

16    United States which is just terrible that woman is now

17    suffering under that conviction.  She can't come to the United

18    States without permission.  And it's just -- and her whole life

19    has changed dramatically.  I don't know what she's doing today.

20          And I -- when I saw that letter last night, that came

21    in I guess late yesterday afternoon, because nothing

22    acknowledged that, nothing -- and I was a little surprised, and

23    when I got that last night I thought it was a factor that was

24    important to me because of all the damage he did to that young

25    woman.

 1              MR. MAHONEY:  I can tell you, Judge, that from my

 2     very first meetings with Tony, it was clear that this was

 3     something which he has never -- he has never complained to

 4     either me or Brian about all the things -- we talk about the

 5     things he's gone through.  He's never complained about it.  He

 6     understands he's brought this on himself, but he is -- but

 7     this -- and I can see that that's the most heartfelt paragraph

 8     in that letter, and I think that is a concern that has been at

 9     the forefront from the very beginning.

10              THE COURT:  Mr. Mahoney, how can you get -- obviously

11     your client is a renowned physician.  He's done great work.

12     He's brilliant.  I think someone indicated that he's in the top

13     one percent in his field.  I wish someone would you say that I

14     was in the top one percent of all the judges in the United

15     States but that's not going to happen.  But it just -- I

16     just -- a man who was so brilliant and the statements that were

17     made how sensitive he is, he's a role model, he's a healer,

18     high moral character, treated his patients, everyday citizens

19     like they were -- and he had such care for them; he had such a

20     concern about their well-being.  I think a little bit more

21     beyond the average physician today.

22              It's kind of unusual reading some of that.  And I was

23     reading it from everyday citizens that I said, from his

24     colleagues.  I mean, his colleagues that wrote on his behalf

25     are -- couldn't be more complimentary.  He was a gold standard.

1    Deeply spiritual.  What was he thinking to find himself in

2    violating the laws of the United States?  I mean, the FDA has

3    these restrictions as to what can come into the country, and I

4    know you take issue with some of that in your submissions, but

5    the FDA has a very important job in caring for the welfare of

6    the citizens of this country that quack doctors or quacks --

7    quack doctors -- people that -- medicine men or whatever don't

8    bring their great stuff that it does more harm.  It's an

9    unbelievable task that the FDA has with so many new substances

10   and things coming out today that I'm sure they're burdened very

11   heavily in trying to deal with all these new substances that

12   are being created every day.

13          But I know that you somewhat take issue with some of

14   these substances really are accepted and all that, but it's

15   against the law of the United States, and until the law changes

16   that's the law.  And we do live in a country where we have to

17   abide by the laws, whether you're a citizen of the country or

18   whether you're an outsider who comes into our country; the same

19   as if we go to a foreign country, we would have to abide by the

20   laws of those countries.  And you looking around the world

21   there are many cultures that have, I think, some things that we

22   obviously would not accept as Americans, but that's their

23   culture and we can't change it unless they change it.

24          So the idea that here's this brilliant physician who

25   was apparently made inroads into this area of pain control that

1    done so much that we just run this risk.  Look at the

2    embarrassment he's caused himself, his family, all the -- he's

3    been on many panels and many different -- all these different

4    professions he's been accepted very well.

5           To some degree now he's being rejected.  And

6    certainly he's suffering more.  And I just can't imagine how he

7    put himself in this position.  It's just mind boggling to me

8    that someone with this gift would not take the extra steps to

9    make sure that he is compliant with the laws of a different

10   country.

11          MR. MAHONEY:  Judge, I think there's no easy answer

12   to that, but for me the answer, having known Dr. Galea for two

13   years now, I think the answer is that what causes that

14   understanding from people about his dedication to healing and

15   what has produced the results that he has seen for his patients

16   is the single minded deal on behalf of the patients.  And that

17   when it came up that patients needed him here in the U.S., they

18   couldn't come to Toronto, I think he just pushed other concerns

19   to the side.

20          And he realized -- you know, again, it was not evil,

21   it wasn't a plan.  He didn't start out with a plan to violate

22   the laws or do anything unlawful.  The plan was to help the

23   patient, and he was cognizant of the need to comply with the

24   rules and made some efforts that were not complete and not

25   thorough.

1          I don't think that's to say it's not an easy

2     explanation, but the very zeal and dedication of the patient

3     that results in these letters to you, and this I think correct

4     understanding you have of his persona, was what -- was maybe

5     the flaw that allowed him to put these concerns aside where

6     other people that were less dedicated, less intensely focussed

7     on the patient would have put these concerns more to the

8     forefront.  But it's the same thing that results in him not

9     charging a lot of patients for --

10          THE COURT:  Well, I noticed in a lot of the letters

11     that he was more concerned with the patients than to earn a

12     fee.

13          MR. MAHONEY:  Yeah.

14          THE COURT:  It seemed to be not a dry word.  That's

15     what I'm saying is here's a man who's like -- almost like, I

16     guess when I go back in my life I think about Marcus Welby who

17     used to be a TV doctor that you always looked up to.  I don't

18     know if we have many of those today.  The profession, the

19     medical profession has changed dramatically in my lifetime.

20     And yet you've got a man who reminded me to some degree in

21     reading all this, reading the reports and all the submissions

22     that somebody has a very unusual quality.

23          MR. MAHONEY:  I actually on one visit up to

24     Dr. Galea's clinic there were two physicians there, one a

25     father; one's from Niagara Falls.  He's been a rheumatologist

1    for about 35 years there, and his son who practices in Chicago.

2    After hearing a five-minute conversation with Dr. Galea at a

3    recent presentation or symposium, they closed down the

4    practices for two days and came to Toronto to watch Dr. Galea.

5    And the father mentioned to me that in ten minutes with

6    Dr. Galea he learned like 20 things that he -- in 35 years he

7    had not learned as a rheumatologist.  And the significance of

8    that, to me, was not only with how other physicians regarded

9    him, but that what he is doing is relevant, not just to sports

10   medicine but the areas like treating arthritis and other

11   conditions that affect the joints.

12          So I agree with everything you said, Judge.  There's

13   no simple answer to it.  It's the kind of, I think his

14   single-minded zeal for his patients and maybe a naivety which

15   he certainly shed at this point.

16          He's been through it, he gets it, he understands now,

17   and he's not just remorseful because of the impact it has had

18   on him and could have on him, but because of the effect on --

19   you know, what will his patients do if he can't take care of

20   them, what will his family do.  And, again, what has also been

21   a major concern situation, as you pointed out, of the position

22   he put Mary Anne Catalano in.  And I know that that's the thing

23   for which he is most embarrassed and most remorseful about as

24   he stands before you today.

25          I guess the final thing I wanted to address, Judge,

1   is very simply, because I think it's -- it's quite obvious that

2   the -- the sentencing guideline setup here under Section 331 of

3   Title 21 covers a broad range of conduct, and it would cover

4   the quack doctors, it would cover people bringing in unsafe

5   medicines, it would cover bringing in the huckster of steroids

6   selling them to adolescents to help build muscles in the gym.

7   It would cover those kinds of individuals.  And that's -- the

8   guideline range we end up with here with all its enhancements

9   is a guideline range that is suitable for that kind of person.

10  And it does not take into account, and I think I can say with

11  confidence --

12          THE COURT:  Well, that type of person you're

13  describing, maybe a guideline of above the guideline range

14  would be appropriate.

15          MR. MAHONEY:  But they have the same guideline range

16  even if you sentenced them above it.  So my point is as a

17  starting point -- the sentencing guideline range in this case

18  doesn't really take into account the dramatic contrast between

19  that core behavior that's of concern which includes -- the

20  guideline range includes not just misbranding but also

21  adulteration, meaning drugs are supposed to be sterile which

22  are not drugs, are supposed to be from legitimate

23  pharmaceutical sources which are not, and on and on and on.

24          And certainly doesn't contemplate the physician who

25  takes widely accepted homeopathic medications using them to

1   treat injuries successfully that others could not do.  And I

2   think it just -- that certainly was -- is probably not what the

3   congress had in mind the 331 and certainly not with the

4   guidelines commission had in adopting the guideline range for

5   that.  There's no adjustments up or down based upon how, you

6   know, good the product is or what, you know, it's being used

7   for accepted medical purpose.  The guidelines just don't --

8   don't take into account those things.

9            So I think that for especially a first time offender,

10  under these circumstances, we have a guideline range of

11  starting out, sets a range which is, in my view, clearly

12  greater than necessary in cases which could fall within

13  Section 331.

14           THE COURT:  Mr. Campana disagrees with you.

15           MR. MAHONEY:  Well, I think, in my view, the

16  government also always takes the position in every case

17  where there's a plea agreement that the sentencing guideline

18  range -- a sentence within the guideline range is appropriate.

19  I haven't seen the government deviate from that in any case --

20           THE COURT:  Well, they have.  I've had cases.

21           MR. MAHONEY:  Well --

22           THE COURT:  You have never seen it, but I have.

23           MR. MAHONEY:  I'm just unlucky in that regard, I

24  guess, but maybe it's me.  But I think that it's -- it's no

25  surprise to me the government's saying, you know, it's -- the

 1   guidelines sentence is appropriate.  And -- but I point out

 2   that when the government did take that position in their

 3   response to our objections, it was without regard without at

 4   all taking into account all of the mitigating factors in the

 5   case, at least not expressly so; perhaps it was.  But I think

 6   that, you know, the reality of it is, I think that when we

 7   strike a deal with the government, a plea agreement, I always

 8   expect the government to say that they -- they believe that a

 9   guideline sentence is appropriate even though they've allowed

10   the defendant to argue for a non-guideline sentence below the

11   range, just as they preserve for themselves an opportunity to

12   argue for a sentence above the guidelines range.  So I just

13   think it's appropriate to point that out.

14          And, Your Honor, I think that obviously our papers

15   outline for you what you already know and can easily tell.

16   There's been a great deal of punishment exacted already on

17   Dr. Galea even if the forfeiture in this case was a civil

18   forfeiture.  In technical terms, forfeiture is a traditional

19   punishment.  He has his license at risk, his reputation is

20   extremely damaged, he's lost career opportunities.

21          And so you've already mentioned, alluded to the

22   consequences of incarceration here for his employees, for his

23   patients.  I do believe that what we've said in our sentencing

24   memorandum that a sentence of commitment would be greater than

25   necessary to achieve the legitimate purpose of the sentencing

1    here.  And I think that even in the context of general

2    deterrence, there aren't many other people like Dr. Anthony

3    Galea contemplating coming across the border to treat patients

4    in U.S. for the -- for the positive reasons that he did that we

5    have to worry about here in terms of deterring.  And I think

6    that this case is a case unique case.  I haven't seen a case

7    like this.

8            I would ask Your Honor to also note though as a more

9    technical point, that given the range -- the new range that we

10   have, this is a range where a lot of times the Court would

11   figure out a sentence which would allow confinement to be home

12   confinement, for example, in this range.  And, in fact, that's

13   just not available because he's a Canadian citizen.  There are

14   options that are not open to the Court in terms of sentencing

15   because of the fact that he's not a U.S. resident and citizen.

16           So I certainly would request that the Court -- in my

17   view, a sentence of -- without incarceration is a sentence

18   which also would not require supervision which I think

19   typically does not occur with Canadian defendants, but I point

20   out that as long as Dr. Galea is under any kind of supervision,

21   it will effectively prevent him from taking the steps -- the

22   initial steps toward trying to get -- seek permission, official

23   permission, to enter the U.S. for authorized purposes.

24           So that the longer that there's any period of

25   supervision, even if it's unsupervised probation, that will

1    delay his ability to seek permission to enter the U.S. and seek

2    status in the U.S. and so on.

3            Just a personal story, Judge, if I may, before I turn

4    it over to Brian.  Your Honor may know I'm a cyclist.  I do a

5    lot of bike riding a couple of times --

6            THE COURT:  You're a kayaker too.

7            MR. MAHONEY:  Yes, Judge.

8            THE COURT:  See you --

9            MR. MAHONEY:  It's my job, Judge, to intrude on other

10   people.

11           So we've done some bike riding together.  He's a very

12   good cyclist, and we were out riding in September, and there

13   was a huge ride of riders coming in the opposite direction.

14   And what it was there was a woman whose husband was an Ontario

15   Provincial Police officer who's was on a bicycle and struck by

16   a motorist and killed.  And she began a local chapter in

17   Ontario of -- a program called "Share the Road" which is

18   basically to increase awareness about bicycle safety and have

19   vehicles be aware of cyclists.

20           And this particular event involved police officers

21   participating in a ride.  And there were, I would say about 200

22   police officers for the Ontario Provincial Police on this ride.

23   And they jerseys show the different -- that they were police

24   officers and so on.

25           So we were -- we stopped at an intersection.  There

1    were about three or four of us.  And this ride goes by -- and

2    now bear in mind the way you're cycling you have sunglasses on,

3    and a helmet, and you have, you know cycling clothing on.  It's

4    not that easy to recognize somebody.  But as they're going by,

5    I would say about 20 percent of the police officers on their

6    bicycles were shouting out Dr. G, Tony, Dr. Galea.  And I said,

7    Tony, what's up with all these cops that are saying hi to you.

8    And he basically -- he treats -- when police officers come in

9    and they're not covered by whatever, he treats them for free.

10   He's treated a lot of these people.

11        THE COURT:  We got letters from them.  There were

12   some letters there.

13        MR. MAHONEY:  Yeah.  I mean, I was blown away by

14   this, Judge.  And, again, you can imagine, not many of my

15   clients get that kind of treatment from police officers.  But

16   it so typifies what you remarked on earlier, that the

17   perception of people they have of him it's genuine, it's deep

18   and it has to do with the kind of person that he really is.

19        And I've got to say that I, like so many people, feel

20   very fortunate to have the opportunity to meet him, and I think

21   that come through in all the letters.

22        So, Your Honor, if I may permit Brian Greenspan to

23   address you at this point and then perhaps if at that point if

24   Mr. Campana has something to say, perhaps we could hear and a

25   chance, if we need to, to respond to something he says and

1    allow Dr. Galea to go at that point.  I don't know if that

2    would --

3                THE COURT:  Well, the defense will go first.

4                MR. GREENSPAN:  Thank you, Mark.

5                First of all, Your Honor, I'd like to express my

6    appreciation for the opportunity to address you.  It's a

7    privilege for which we're grateful.

8                The personal perspective is someone who grew up

9    17 miles downstream on the Canadian side of Niagara.  I was

10   always influenced greatly by Buffalo by listening to Chuck

11   Healy on the broadcast from Buffalo and coming back from the

12   stadium to watch the Bisons.  But as many people of my

13   generation, we were most influenced by our view of America by

14   something that was said by President Kennedy when he addressed

15   the Canadian Parliament in 1961 in terms of the relationship

16   which our countries shared.  President Kennedy said:  The

17   geography of its neighbors history that made us friends,

18   economics that made us partners, and necessity has made us

19   allies; what unites us is far greater than what divides us.

20   Indeed, what's basically fundamental by our legal cultures is

21   our principles of fundamental justice is decremented (phonetic)

22   in decisions; what unites us is far greater than what divides

23   us.

24               Yet when I address you on behalf Dr. Galea, I do so

25   with some trepidation, for I do so with both greatest respect

1    for Your Honor and for the courts of the United States and for

2    the system of justice of the United States, but I also do so as

3    a Canadian lawyer with a Canadian perspective.

4          Last weekend Justice Morris Fish of the Supreme

5    Court -- of the Supreme Court of Canada spoke in Toronto to the

6    Criminal Lawyers Association annual convention.  And he's one

7    of Canada's most distinguished jurists and criminal lawyers who

8    was on the Court of Appeals of Quebec and one of the most

9    distinguished members of the criminal bar of Quebec before his

10   elevation to the Supreme Court happened.

11         He devoted a significant portion of his remarks to

12   what he said were the most fundamental policies and principles

13   of sentencing in Canada.  And he talked about the concept, the

14   age-old concept of lex talionis and said that lex talionis

15   really meant proportionality tempered by restraint.  And

16   proportionality tailored with not only to the specific

17   circumstances of the offense, by taking into account the

18   oftentimes unique characteristics, feelings and contributions

19   of the offender.

20         And as far as I can understand, Your Honor, very much

21   the concept of a sentence in the United States that is no

22   greater than necessary, which I understand to be a fundamental

23   principle of sentencing in this country.

24         I want to very briefly discuss with you -- and very

25   brief -- because quite frankly my task has been significantly

1    reduced by what is clear, and as Your Honor has expressed, your

2    very, very clear understanding of all the letters, the

3    sentiments expressed, high praise for not only his talent, his

4    dedication, but his focus on the healing arts as being so

5    fundamental to his person.  But he is a person that's made a

6    major contribution, not only to the health and welfare of his

7    community, but he's someone who in the world known in the

8    Canadian world of sports medicine but the world's world of

9    sports medicine is really continued to make a significant

10   contribution on so many levels.

11          In the materials that Mr. Mahoney filed on behalf of

12   Dr. Galea, there is a section near the end that reviews these

13   letters of support and occasionally quotes from them.  And in

14   many ways it's mentally representative of those sentiments.  As

15   you expressed, many of his colleagues viewing him as being

16   among the one or two top -- one or two percent of the top of

17   his profession were the most sought after experts by

18   physicians, athletes, patients around the world.  And that

19   international reputation is not only shared by physicians in

20   Canada in the United States, but a whole host of physicians as

21   you saw where he's made such an important contribution in the

22   state of Israel to injured soldiers and people who have had

23   significant injuries.

24          As well as what's perhaps of significance is that

25   people have been prepared to come forward.  And I want to make

 1    it clear we decided quite intentionally not to seek out the

 2    athletes and the well-known celebrities who he has treated and

 3    assisted in their rehabilitation over the years.  We

 4    intentionally didn't seek out those people.  And, in fact, we

 5    rarely solicited these letters.  These letters -- most of these

 6    letters at least were letters from the heart from people who

 7    volunteered.  And indeed to this day our office receives on a

 8    continuing basis, almost a daily basis, the offers of

 9    assistance, the offers of letters, the offers of support from a

10    wide variety of people in the Toronto and in the Canadian

11    community.

12           Team coaches and sports owners and indeed you saw

13    that former owner of the Toronto Argonauts, the Canadian

14    football league said that of Dr. Galea:  I can honestly say

15    I've never met a more compassionate, dedicated, intelligent,

16    loyal and authentic individual in all my life.  And as you

17    probably noted, that same owner dedicated a very impressive

18    sculpture at the Sheba Medical Center in Tel Hashomer, Israel

19    in honor of Dr. Galea.  This is the type of person who really

20    in terms of his compassion, his dedication, his devotion to his

21    profession and to his patients really is in many ways a

22    Canadian treasure.

23           In this country, people of real significance, people

24    who themselves are great Americans as you saw from

25    Bestor (phonetic) Young, retired Rear Admiral Carey who from

1  the heart advised Your Honor, advised the public, advised

2  whoever is prepared to read that this is -- and I'm quoting per

3  Admiral Carey -- a man truly of exceptional character, a person

4  who, through expansive charitable work and giving back to

5  society is almost without equal.  Calls him a patriot.  I'm not

6  sure of what country.  I think perhaps a patriot of the world.

7  And he's a patriot with commitment to his faith and religion

8  and father caring for his seven children.

9         THE COURT:  Why is there so much adverse publicity?

10  Why was this case received a lot of unflattering reporting?

11         MR. GREENSPAN:  In my view, and I say this with

12  respect to the fifth estate, and that is that what occurred

13  from the outset was the desire to explode this case into a case

14  of the misuse of drugs.  It wasn't understood properly.  It was

15  thought to be a case of performance enhancement.  And

16  performance enhancement is always been defined as bigger,

17  stronger, faster.  And this case has nothing to do with bigger,

18  faster or stronger.  It is only something to do --

19         THE COURT:  Do you have any evidence to support that

20  otherwise, what he's just saying?

21         MR. CAMPANA:  No, Your Honor.  We never took the

22  position, and we don't, that Dr. Galea's intent was to make

23  athletes bigger, faster and stronger.

24         THE COURT:  I've read nothing that would suggest that

25  and that's why I was -- I asked the question why did this

1    receive such widespread unflattering reporting.

2           MR. GREENSPAN:  And, Your Honor, regrettably when

3    reads that unflattering reporting, the inference to be drawn

4    from it was that in some way Dr. Galea was engaged in conduct

5    in which he categorically was not engaged in.

6           So that it's a misrepresentation of the type of

7    activities in which he engaged his --- not only his intent, his

8    actual acts and actions were always the person presented with

9    an injury, that was first and foremost the premise of what

10   occurred.

11          He presented with an injury, he presented with a

12   deficiency, and it was an attempt to address that injury or

13   deficiency from a solid and sound medical perspective.  That

14   was his only intent and the only expectation of the athletes

15   that he dealt with.  If you take a look at some of the

16   publicity --

17          THE COURT:  These treatments did receive -- there

18   were some controversy as far as the treatments are concerned.

19          MR. GREENSPAN:  Well, this is --

20          THE COURT:  I mean, there is some within the medical

21   profession.

22          MR. GREENSPAN:  There is a debate about the efficacy

23   of some of the treatments.  And indeed, let me be very candid,

24   five years ago when Dr. Galea was at the cutting edge of PRP

25   treatments, platelet rich plasma treatments, there was

 1    controversy about PRP.  There was a controversy particularly in

 2    America about the use of PRP.  Now, it's standard practice.

 3          Every major league baseball player who has a rotator

 4    cuff injury goes to American physicians who in their clinics

 5    are utilizing PRP in a widespread basis.  Some of whom, five

 6    years ago, were critical of Dr. Galea who then was at the

 7    cutting edge of PRP and one of the first promoters and pioneers

 8    of its use.

 9          That's why the Steadman Clinic wanted him.  That's

10    what the Steadman Clinic was talking about in terms of being

11    the leader in the area of regeneration and in terms of muscle

12    and tendon injuries.

13          So that that type of leading and current research and

14    leading edge is what Dr. Galea's always been the best.  He's

15    pushed the envelope in terms of thinking and in terms of new

16    research, but it's always sound and has only one objective, the

17    art of healing, and that's really his life's work and the

18    dedication that he's demonstrated throughout his life.

19          At the same time, and I don't want to in any way

20    suggest in any way that Dr. Galea shins from the acceptance of

21    his responsibility for the offense, his shame, his regret,

22    sincere remorse, and I -- Your Honor's read the letter that he

23    provided.  That letter, again, as Mr. Mahoney has said, he

24    expressed it privately countless times and now publicly and I

25    think quite insightfully in the letter to Your Honor, he

1    expresses his remorse, regret and shame.

2              Mr. Mahoney has talked about some of the collateral

3    damage, the risk to his licensing, the fact that he's already

4    sustained some significant damage to his reputation, the

5    removal from various associations, the suspension in his

6    teaching role in many areas that hopefully will be restored in

7    the very near future.

8              And I needn't read excerpts, but I do think that and

9    it's the belated -- the one letter that was received as Your

10   Honor pointed out from one professional athlete, a retired

11   professional athlete, who's present in Court, Ty Domi.  And one

12   of the interesting aspects of Mr. Domi's very thorough and

13   articulate and insightful letter, he talks about Dr. Galea as a

14   brilliant physician, the medical innovator, one of the most

15   caring, compassionate and dedicated individuals I know.  He's

16   someone who said that he was in a privileged position and

17   privileged life as a professional athlete.  He met many

18   extraordinary medical specialists, and Dr. Galea perhaps the

19   best.

20             He says while he appreciates the serious nature of

21   the charges against Dr. Galea, I also urge you to take into

22   account Dr. Galea's track record of compassion, of his service

23   to his patients, and the impact that charges against him have

24   had on this gentle man and his family.

25             And it led me to think about, and I've occasionally

1    in my career reverted to -- not a reliance on but an analogy to

2    the Judeo Christian concept of the book of life and debits and

3    credits in one's life, and almost like a lecture in some ways.

4    And Dr. Galea at no point in his life had ever thought that

5    he'd have to call upon the credits.

6          The credits in his life were heartfelt, they were

7    sincere, they were part of who he is, and yet he built up that

8    wealth of credit that his life's work has provided and the

9    caring that he's had throughout his life has given to him.

10          And I say with great respect that at some time, and

11   it's only right and proper that, you know, imposing a sentence

12   no greater than necessary, that the credit side in mitigation

13   is exhausted, is fully exhausted.  Anthony Galea will never

14   again have to utilize the credit side of the ledger.  It's time

15   to utilize it in my respectful submission to Your Honor in

16   mitigation of the sentence, and we ask that a non-custodial

17   sentence be imposed.

18          Thank you for your consideration, sir.

19          THE COURT:  Mr. Galea, this is your opportunity, sir,

20   to say anything you'd like to say.

21          THE DEFENDANT:  First I want to apologize to the

22   United States of America for violating the laws and

23   regulations.  I want to apologize to the government; the FDA

24   for violating its rules and regulations; to the FBI for causing

25   so much grief in the investigation; to the Department of

1    Homeland Security for violating their trust in me coming

2    across.

3              I would also like to apologize to Mary Anne Catalano

4    and her family for the turmoil I caused them, but specifically

5    I want to apologize to her mom and dad and her grandfather who

6    entrusted her well-being to my hands and I blew it.  And I'll

7    never forgive myself for that.

8              I'd like to apologize to my wife and family and

9    friends for my overzealousness in trying to heal the pain in

10   others and their injuries.  I caused a lot of suffering and

11   pain in the ones I love, and that's tough.  And that's it, Your

12   Honor.

13             THE COURT:  Mr. Campana.

14             MR. CAMPANA:  Thank you, Judge.

15             A minute ago the Court asked about the government's

16   view concerning the issue of performance enhancement.  And

17   there are two halves to that answer.  One is we don't allege

18   that Dr. Galea intended to enhance the performance of his

19   patients when they were athletes to make them bigger, faster

20   and stronger, but he did know that at least one of the

21   treatments that was given involved a substance that was banned

22   by the sports leagues they played in.

23             So in addition to putting Ms. Catalano in a very

24   difficult position, he did put these athletes in a position

25   where they were out of compliance with the rules of the sports

1    they played, and we regard that as a serious thing too.

2            But generally, Judge, what we had here is a case --

3    and just to review the facts without a lot of detail.

4    Dr. Galea started coming here for one purpose and then

5    continued to do it on a large scale, numerous times.  And the

6    Court referred to the mission of the FDA as being a very

7    important job, an awesome task were the mission of the FDA is

8    to ensure the health and safety of people who live in the

9    United States.  And the Food, Drug and Cosmetic Act is designed

10   to make sure that medications are safe, and there's rules and

11   regulations for that.

12           But there's another agency, and Dr. Galea mentioned

13   this, and that's Homeland Security.  They have a mission too.

14   And their mission is to be sure that inspecting everyone who

15   enters the United States enters for a lawful purpose.  And

16   Dr. Galea undermined that purpose as well as the purpose of the

17   FDA on many times, many occasions; more than 150.

18           And Dr. Galea indeed is a -- is a skilled physician.

19   But it's not enough to do things well.  It's necessary that

20   they be done lawfully.  And we have laws that are designed to

21   ensure that.

22           For that reason, Your Honor, we ask the Court to

23   impose the sentence within the guideline range you found,

24   because we think that would be the sentence that would ensure

25   respect for the law and to ensure that there isn't undue

 1   disparity.

 2          Thank you.

 3          THE COURT:  Well, you say undue disparity,

 4   Mr. Campana, there's a lot of factors that have to be taken

 5   into consideration; the 3553 factors.  So there's -- it's

 6   unwarranted disparity, a disparity that seems to shock one's

 7   conscious and that's what the sentencing commission has

 8   considered it.

 9          I'm going to ask you a tough question:  Why do you

10   feel that justice would be better served to put him in prison

11   for, let's say, a year?

12          What would that accomplish in the -- in the interest

13   of justice, why is the United States serve -- what would the

14   United States benefit by that?  Here you have a man, and I'm

15   not suggesting what I'm going to do right now, okay, but here

16   you have a man -- and you've got all those letters, I'm sure.

17          MR. CAMPANA:  I did.

18          THE COURT:  Okay.  It wasn't an easy task.  And

19   believe me, it wasn't, but there was -- I didn't see anything

20   at all anywhere in the report to disagree with anything that

21   was said in those letters.

22          Now, there's one thing about the legal aspects of it,

23   you know, you violated the law, there's no question about it.

24   And those laws are very, very important for all of us that they

25   enforce and people abide by them.  But on the other hand,

1    you've got to look at the 3553 factors.  And have you ever seen

2    a case, ever seen a case ever in your career, Mr. Campana, that

3    there were more 3553 factors for the Court to consider other

4    than here?

5           Because I -- and I have had more cases that you've

6    had and I do this every day and I sentence every day.  I can't

7    recall a case that has more 3553 factors.

8           Now, certainly the fact that he brought that young

9    woman involved in this thing, the fact that he violated the

10   law, those factors certainly have to be carefully considered.

11   And they are important -- there's no question about it -- in

12   the administration of justice, but the 3553 factors have to be

13   considered too.  And when you consider them, they're pretty

14   strong on this case, in my opinion.  They seem to be

15   overwhelming.  And it was just -- it was the whole range of

16   where these letters came from.  That's what kind of really

17   impressed me.  And there was a constant theme here, and that is

18   that he was -- devoted his life to healing.  Not to performance

19   enhancements, not to do anything other than to practice

20   medicine to the best of his ability.  And some individuals

21   indicated he's like the top of his field.

22          So what is to be gained if he were to serve, let's

23   say, a year in prison?

24          A deterrent factor?

25          MR. CAMPANA:  Yes, that; and respect for the law.

1          THE COURT:  Deterrence is an absolutely

2    overwhelming -- let me tell you something.  When I first got

3    this report -- well, I'll tell you in a little while -- you

4    know, this is, from reading everything, and you have to almost

5    life in a cave not to be aware.  There's been a lot of

6    publicity in this case, and it's been painted many reports very

7    different than from the reports that I read here in this court

8    proceeding.

9          So tell me why you think that a period of

10   incarceration would serve the general good?  Why would it serve

11   the interest of the United States?  And I know deterrence is

12   important, but you have a lot of factors here.  You've got

13   factors of, you know, someone commits a crime, there's a degree

14   of accountability that varies.  Someone who robs a bank who

15   really probably didn't do much in his life, obviously he'll go

16   to prison, but there's not a lot of collateral damage.  Not as

17   much at least from a man who was -- is well-recognized in the

18   community as being on the cutting edge of the medical

19   profession.

20          I interrupted you.

21          MR. CAMPANA:  Yes.

22          THE COURT:  I know --

23          MR. CAMPANA:  No, I appreciate the question.

24          THE COURT:  But I do -- deterrence is a driving force

25   here for me, let me tell you.

1          MR. CAMPANA:  Judge, this isn't either for the

2    government and for the Court.

3          THE COURT:  No, this is not an easy case for me,

4    Mr. Campana.

5          MR. CAMPANA:  I was going to say -- I was going to

6    say it's not a ground ball.

7          THE COURT:  It's not an easy case for anybody.

8          MR. CAMPANA:  It is not a ground ball or a routine

9    pop fly or anything of the sort, but there's two aspects that

10   can be looked at here.  Today was an occasion for the defense

11   to talk about the defendant, Dr. Galea, because the Court has

12   to sentence a man.  And part of what the Court does is sentence

13   a man for who he is and who he's been, but I want the Court to

14   be mindful, as I know it will be, to be conscious also of the

15   offense, and I would just remind the Court, in case it needs

16   reminding, and it I'm sure it doesn't --

17         THE COURT:  I think your position is that --

18         MR. CAMPANA:  This was serious.

19         THE COURT:  -- challenging Mr. Mahoney on some of the

20   issues that he raised were irrelevant, and I basically in some

21   degree I agree with you on that.

22         MR. CAMPANA:  The repeated -- the repeated conduct

23   and putting others in jeopardy including some of the patients.

24   As long as the Court's sentence is mindful of those two things,

25   what the offense conduct was, I understand the Court's need

1    also to account for the man Dr. Galea has been represented to

2    be.

3           THE COURT:  Let me go over some of those 3553

4    factors, and this is the controlling issue for the Court to

5    always consider.  Factors to be considered in imposing

6    sentence:  The Court shall impose a sentence sufficient but not

7    greater than necessary to comply with the purposes set forth in

8    paragraph 2; the nature and circumstances of the offense; and

9    the history and characteristics of the defendant; the need for

10   the sentence to be imposed to reflect the seriousness of the

11   offense and promote respect for the law; and provide just

12   punishment for the offense before adequate deterrence to the

13   criminal conduct; to protect the public from further crimes of

14   the defendant; provide the defendant with needed educational or

15   vocational training, medical care or other correctional

16   treatment in the most effective manner.  Those are the factors.

17          MR. CAMPANA:  We don't think he needs the medical

18   care, and the last, but the two --

19          THE COURT:  You have to protect him from the public.

20          MR. CAMPANA:  The two most important things, Your

21   Honor, are deterrence and respect for the law.

22          THE COURT:  I agree with that.

23          MR. CAMPANA:  And it is naturally the case, I

24   believe.

25          THE COURT:  Any question at all about the

1    remorsefulness here, challenge --

2              MR. CAMPANA:  Up until yesterday, yes, Your Honor,

3    but when we received that -- we received the letters from

4    yesterday, especially Dr. Galea's letter --

5              THE COURT:  Well, he had -- there was a first letter

6    that he wrote.  This was the second letter.

7              MR. CAMPANA:  That was published or that was filed

8    yesterday.

9              THE COURT:  There was another letter though in the --

10   letter number one, I believe.

11             MR. CAMPANA:  That was --

12             THE COURT:  Am I right on that?

13             MR. CAMPANA:  That was filed yesterday.

14             THE COURT:  Yeah.  Oh, no, I'm sorry.

15             MR. MAHONEY:  I don't believe so, Judge.

16             THE COURT:  There was so many letters.

17             MR. CAMPANA:  Yesterday was the first time that we

18   heard that he regretted placing --

19             THE COURT:  I was waiting to see that because the

20   young woman was in here.

21             MR. CAMPANA:  We waited for that too.

22             THE COURT:  And I don't know whether -- I believe it

23   was a sincere statement.  I have no reason to believe

24   otherwise.

25             Anything further?

1          MR. CAMPANA:  No.

2          THE COURT:  I need a break.  We've been going an hour

3   and 20 minutes.  Let's take a 15-minute break.  The Court will

4   be in recess.

5          (A recess was taken at 2:20 p.m.)

6          THE COURT:  Are we ready?

7          MR. CAMPANA:  We are.

8          THE COURT:  Pursuant to the Sentencing Reform Act of

9   1984, it's the judgement of the Court that the defendant is

10  hereby committed to the custody of the Bureau of Prisons to be

11  in prison for a period of time served.

12          The cost of incarceration fee is waived.

13          He shall be placed on supervised release for a period

14  of one year.  While on supervised release, he shall not commit

15  another federal, state or local crime; shall be prohibited from

16  possessing a firearm or other dangerous device.  In addition,

17  he shall not possess a controlled substance.  Shall comply with

18  the standard conditions adopted by the Court.

19          Since the defendant is a Canadian citizen and will

20  return to Canada, he shall not reenter or attempt to reenter

21  the United States without written authorization of the

22  Secretary of Homeland Security.  Reentry into the United States

23  without approval of the Secretary of Homeland Security will

24  constitute new criminal conduct which may subject the defendant

25  to criminal prosecution.  Reentry without approval during the

1    term of supervision will be considered a violation of the

2    conditions of supervised release.

3           Because he is a resident of the city of -- citizen of

4    Canada, the term of supervised release shall be unsupervised.

5           In view of the fact that there is a 275,000 civil

6    forfeiture that he has already paid, as I understand it.

7           MR. CAMPANA:  Yes.

8           MR. MAHONEY:  Yes.

9           THE COURT:  Okay.  The Court does not feel that an

10   additional fine is warranted.  The Court will waive the fine.

11          However, I will order the mandatory special

12   assessment of $100 which is due immediately.  I would suggest

13   that he make that payment today.

14          MR. MAHONEY:  Yes, Judge.

15          THE COURT:  In determining the sentence, the Court

16   has considered the advisory guideline range and the points

17   raised by the counsel for the defendant -- the defendant and

18   the government as to what the appropriate sentence should be.

19          In addition, I have considered the factors set forth

20   in 18 U.S.C. 3553(a) and finds the sentence imposed is

21   sufficient, but not greater than necessary to comply with the

22   purpose of sentencing set forth in 18 U.S.C. 3553(a).

23          I have sentenced to a non-guideline sentence to time

24   served.  The Court notes that during the period set forth in

25   the indictment, even though he only pleaded to Count 3, that

1    this whole activity took place from February, 2007, to

2    September, 2009, he was a citizen and a resident of Canada and

3    was a physician licensed to practice medicine in the Province

4    of Ontario.  He was not licensed to practice medicine in the

5    United States.

6            He continues to operate a medical business practice

7    today in Canada known as the Institute of Sports Medicine

8    Health and Wellness Center.  During the relevant time period

9    Ms. Catalano was employed by the defendant and worked as his

10   assistant.

11           I note that he is a lifelong resident of the Province

12   of Ontario.  He's raised with a very supportive and loving

13   environment where athletics and education were encouraged.

14   He's been married on two occasions and has seven children

15   ranging from the age of three to twenty-two.  He's obviously

16   well-educated and no prior record; no history of substance

17   abuse.

18           He appears to be a soft-spoken, humble man as

19   evidenced by the extensive letters of support.  Appears to be a

20   well-respected and well-liked member of the medical profession,

21   and certainly is respected by the number of patients that he

22   has treated over the years.

23           There's no question that he embarked on a career of

24   sports medicine striving to be on the cutting edge of treating

25   injuries related to patients' muscles, tendons and joints

1   without the need for surgical procedures over the course of his

2   career.  There's no question he sought to educate himself or

3   treat patients utilizing at the time unconventional methods in

4   an effort to provide better medical care for patients.

5          I conclude from reading the materials that his travel

6   to Israel to practice there for a time was motivated in part

7   for a desire to enhance his skills and learn different

8   techniques for patients.  He has reportedly treated thousands

9   of patients for various athletic ability injuries, provided

10  consultation for professional sports teams and treatment.

11  Appears to have led other professional athletes to experience a

12  myriad of injuries to seek out his services.

13         While the -- his legal inability to practice medicine

14  in the United States is a pertinent part of the facts involved

15  in this case, the reality is that he's pleaded guilty to

16  bringing misbranded drugs into the United States.  He's

17  acknowledged that.  He realizes that he should have been more

18  truthful with both the intent of entering the United States in

19  a manner in which he used to treat his athletes.

20         There's no question he's paying a huge price for his

21  misdeeds.  He has been portrayed in the media as a performance

22  enhancing physician, although there's no evidence that I have

23  seen, or the government's presented to me that that's true.

24         His practice has a -- as I understand it, a practice

25  that's still very viable.  But there's no question he suffered

1    irreparable harm as a result of this conviction.  The defendant

2    appears to be -- have a genuine desire to be a healer, and

3    apparently his focus on providing his current optimal treatment

4    for his patients ultimately led to this consequence which he's

5    here today.

6          I believe that the primary interest is and has been

7    from healing injuries.  However, he appears to have been

8    impatient and reportedly sought some direction or made some

9    attempts to obtain a visa and permission to work in this

10   country.  His choice put himself above the law, and to engage

11   in conduct that has seriously tarnished his reputation,

12   diminished his career and been very financially detrimental to

13   himself and his family.  He obviously has no one to blame but

14   himself.

15         The Court finds that a period of incarceration would

16   not outweigh the benefit of what he has to offer to his

17   patients.  He appears to be genuinely remorseful and contrite.

18         I was -- we talked earlier about Ms. Catalano and

19   that letter that I received last night suggesting his true

20   remorse as to what he caused her, and he indicated that in

21   Court today, and I certainly have no reason to believe that.

22         I also was very impressed with the letters filed on

23   his behalf.  I don't remember ever in my career receiving such

24   a cross-section of letters from so many people of saying such

25   wonderful things about him which obviously had an impact on

1    this Court.

2          I know that there is a pending matter in Canada for

3    conduct similar to here.  I don't know exactly what that's

4    going to result in but he's still -- he's going to have to deal

5    with the Canadian laws.  It's unlikely that he'll ever be able

6    to practice law (sic) in this country and that whether he'll

7    ever be able to be admitted to the United States is something

8    that this Court has no jurisdiction in.

9          I note that he's paid this civil forfeiture of

10   $275,000 which was certainly a large amount of money, and

11   apparently that was part of the plea agreement that he entered

12   into.

13         The United States also agreed to dismiss the other

14   four counts in the indictment, and obviously the Court thought

15   that this was an important consideration, not only to require

16   him to plead to the major count.

17         I am not imposing a fine.  I believe the civil

18   forfeiture is adequate compensatory payment for him to make.

19         Sir, you have a right to appeal this sentence if you

20   feel the Court misapprehended its authority or it imposed an

21   illegal sentence.  However, you did waive your right to appeal.

22   If you feel that waiver is not a valid waiver, you may take

23   that issue up before the Second Circuit Court of Appeals.

24         Mr. Campana.

25         MR. CAMPANA:  We ask that the open counts be

1    dismissed.   Those would be 1 and 2, and 4 and 5.

2              THE COURT:  Motion's granted.

3              Anything further, Mr. Mahoney?

4              MR. MAHONEY:  No, Judge.

5              THE COURT:  Mr. Campana, anything further?

6              MR. CAMPANA:  No.

7              THE COURT:  All right.  The Court will be in recess.

8              MR. MAHONEY:  Thank you very much, Your Honor.

9              (Proceedings concluded at 2:42 p.m.)

10                          *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3           I certify that the foregoing is a correct

4    transcription of the proceedings stenographically recorded by

5    me in this matter.

6

7

8                                    S/Yvonne M. Garrison, RPR

9                                    YVONNE M. GARRISON, RPR
                                     Official Reporter
10                                   U.S.D.C., W.D.N.Y.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25